COSTLE, ADMINISTRATOR, ENVIRONMENTAL
PROTECTION AGENCY *v.* PACIFIC LEGAL
FOUNDATION ET AL.

No. 78–1472. Argued December 5, 1979—Decided March 18, 1980

BLACKMUN, J., delivered the opinion for a unanimous Court.

*William Alsup* argued the cause for petitioner. With him on the briefs were *Solicitor General McCree, Assistant Attor-*

*ney General Moorman, Deputy Solicitor General Claiborne, Angus Macbeth,* and *Raymond W. Mushal.*

*Robert K. Best* argued the cause for respondents. With him on the brief for respondents Pacific Legal Foundation et al. were *Ronald A. Zumbrun* and *Thomas E. Hookano. Burt Pines* and *Frederick N. Merkin* filed a brief for respondent City of Los Angeles.

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case, in a sense, is a tale of a great city's—and the Nation's—basic problems in disposing of human waste. "How" and "where" are the ultimate questions, and they are intertwined. The issues presently before the Court, however, center in the administrative processes by which the city and the Nation seek to resolve those basic problems.

## I

Respondent city of Los Angeles owns and operates the Hyperion Wastewater Treatment Plant located in Playa Del Rey, Cal. Since 1960, the Hyperion plant has processed most of the city's sewage, and has discharged the wastes through three "outfalls" extending into the Pacific Ocean. The shortest outfall terminates about one mile from the coastline in 50 feet of water. It is operative only during emergencies caused by increased sewage flow during wet weather or by power failures at the pumping plant. The second outfall terminates about five miles out. Approximately 340 million gallons of treated wastewater are discharged every day into the ocean, at a depth of 187 feet, through that outfall. This wastewater receives at least "primary treatment," [1] but about

---

[1] Under applicable regulations, the Environmental Protection Agency defines "primary treatment" as "the first stage in wastewater treatment where substantially all floating or settleable solids, are removed by floatation and/or sedimentation." 40 CFR § 125.58 (m) (1979).

one-third of the flow also receives "secondary treatment"[2] by an activated sludge process. The third outfall terminates about seven miles from the coast. It is through this third outfall that the solids that have been removed during treatment are discharged into the ocean, at a depth of 300 feet. Prior to discharge the solid materials, commonly referred to as sludge, have been digested, screened, and diluted with secondary effluent. App. 3–4.

The Hyperion plant is operated under permits issued by the Environmental Protection Agency (EPA) and the California Regional Water Quality Control Board (CRWQCB). Such permits are issued pursuant to the National Pollutant Discharge Elimination System (NPDES), established by § 402 of the Federal Water Pollution Control Act (FWPCA), as added by the Federal Water Pollution Control Act Amendments of 1972, 86 Stat. 880, and as amended, 33 U. S. C. § 1342 (1976 ed. and Supp. II).[3] The FWPCA was enacted with a

---

[2] The agency by its regulations describes "secondary treatment" as that treatment which will attain "the minimum level of effluent quality . . . in terms of . . . parameters [sic]." These so-called "parameters" (but compare any dictionary's definition of this term) are specified levels of biochemical oxygen demand, suspended solids, and pH values. 40 CFR §§ 125.58 (r) and 133.102 (1979).

[3] In March 1973, the EPA and the California State Water Resources Control Board entered into an understanding that gave the State primary responsibility for administering the NPDES program in California, with the EPA retaining jurisdiction over discharges beyond the limits of the territorial sea, that is, more than three miles out from the coastline. EPA permits are thus required for the Hyperion plant's discharges through the 5- and 7-mile outfalls. The CRWQCB, acting pursuant to California's Porter-Cologne Act, Cal. Water Code Ann. § 13260 et seq. (West 1971), also requires a state permit for these outfalls.

A general description of the original Federal Water Pollution Control Act passed in 1948, 62 Stat. 1155, the events that led to the 1972 Amendment, and the operation of the NPDES program, with particular emphasis on its implementation in California, is set forth in EPA v. State Water Resources Control Board, 426 U. S. 200, 202–209 (1976), and need not be repeated here.

stated and obviously worthy objective, that is, "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." § 101 (a), 86 Stat. 816, 33 U. S. C. § 1251 (a). In order to achieve that objective, Congress declared that "it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985." § 101 (a)(1).

As one means of reaching that goal, Congress in § 301 (a) of the FWPCA provided: "Except as in compliance with this section and sections 302, 306, 307, 318, 402, and 404 of this Act [33 U. S. C. §§ 1312, 1316, 1317, 1328, 1342, and 1344], the discharge of any pollutant by any person shall be unlawful." 86 Stat. 844, 33 U. S. C. § 1311 (a). Section 402 (a)(1) authorizes the Administrator of the EPA, "after opportunity for public hearing," to issue a permit for the discharge of any pollutant, notwithstanding § 301 (a), upon condition that such discharge will meet all applicable requirements established in other sections of the Act, or such conditions as the Administrator determines are necessary to carry out the Act's goals and objectives. 86 Stat. 880, 33 U. S. C. § 1342 (a)(1). One of the requirements applicable to an NPDES permit for a publicly owned treatment works, such as the Hyperion plant, is specified in § 301 (b)(1)(B). That provision requires such works in existence on July 1, 1977, to achieve "effluent limitations based upon secondary treatment as defined by the Administrator." [4] 86 Stat. 845, 33 U. S. C. § 1311 (b)(1)(B).

---

[4] Although the EPA has taken the position in this litigation that § 301 (b)(1)(B) required the city to end the Hyperion plant's discharge of sludge into the ocean by July 1, 1977, the compliance schedule incorporated in the 1975 NPDES permit required the city to achieve total "sludge-out" by April 1978. The EPA asserts that this less stringent compliance schedule was necessitated by the practical inability of Los Angeles to meet the FWPCA's requirements. Reply Brief for Petitioner 8, n. 5. Congress subsequently has acted to permit the operator of a publicly owned treatment works, in certain circumstances, to request the

## II

The EPA has promulgated regulations providing for notice and public participation in any permit proceeding under the NPDES. Those regulations, implementing the statutory requirement that any NPDES permit be issued "after opportunity for public hearing," are the focus of this case. The regulations state: "Public notice of the proposed issuance, denial or modification of every permit or denial shall be circulated in a manner designed to inform interested and, potentially interested persons of the discharge and of the proposed determination to issue, deny, or modify a permit for the discharge." 40 CFR § 125.32 (a) (1978).[5] That public notice "shall include at least": (1) circulation of the notice within the affected geographical area by posting in the post office and "public places" nearest the applicant's premises; or posting "near the entrance to the applicant's premises and in nearby places," or publication in local newspapers; (2) the mailing of notice to the permit applicant and "appropriate" federal and state authorities; and (3) the mailing of notice to any person or group who has requested placement on the NPDES permit mailing list for actions affecting the geographical area. *Ibid.*

Following the issuance of public notice the EPA Regional

---

EPA Administrator to extend the time allowed for achieving the limitations of § 301 (b) (1) (B). Compliance must be attained, however, by July 1, 1983. Clean Water Act of 1977, Pub. L. 95–217, § 45, 91 Stat. 1584, 33 U. S. C. § 1311 (i) (1) (1976 ed., Supp. II). The city has applied for an extension of the July 1, 1977, secondary-treatment deadline established by § 301 (b) (1) (B), but that application has not yet been acted upon by the EPA. Brief for Respondent City of Los Angeles 6, n. 5.

[5] The EPA's public participation regulations were modified after the events central to this case took place. 44 Fed. Reg. 32854 (1979). Many features of the regulations that are at issue here, however, have been retained. See 40 CFR §§ 124.41–45, 124.61–64, 124.71–101, 124.111–127, and 124.131–135 (1979). All references in this opinion to the EPA's public participation regulations, unless otherwise designated, are to the 1978 compilation.

Administrator is directed to provide at least a 30-day period during which interested persons may submit written views concerning the proposed action or may request that a hearing be held. § 125.32 (b)(1). If the Regional Administrator "finds a significant degree of public interest in a proposed permit," he is directed to hold a public hearing on the proposed action at which interested parties may submit oral or written statements and data. § 125.34. Following a determination by the Regional Administrator to take a proposed permit action, he is directed to forward a copy of that determination to any person who has submitted written comments. If the determination is substantially changed from the initial proposed action, he must give public notice of that determination. In either event, his determination constitutes the final action of the EPA unless a timely request for an adjudicatory hearing is granted. § 125.35.

Any interested person, within 10 days following the date of the determination, may request an "adjudicatory hearing" or a "legal decision" with respect to the determination. § 125.36 (b). A request for an adjudicatory hearing is to be granted by the Regional Administrator if the request "[s]ets forth material issues of fact relevant to the questions of whether a permit should be issued, denied or modified." § 125.36 (c)(1)(ii). Issues of law, on the other hand, are not to be considered at an adjudicatory hearing. If a request for an adjudicatory hearing raises a legal issue, that issue is to be referred by the hearing officer to the EPA's Assistant Administrator for Enforcement and the General Counsel for resolution. If a request for an adjudicatory hearing raises only legal issues, a hearing will not be granted and the Regional Administrator will refer those issues to the aforementioned officers. § 125.36 (m).

### III

The EPA and the CRWQCB first issued a joint permit to the city of Los Angeles for discharges of treated sewage

from the Hyperion plant in November 1974. See App. 4. That permit, covering only the 1- and 5-mile outfalls, was issued following EPA publication of notice of its intent to issue a permit, an opportunity for the submission of written comments, and a public hearing. On August 18, 1975, the 1974 permit was rescinded by the federal and state authorities, and replaced with a permit covering all three outfalls. *Id.,* at 3. The 1975 permit conditioned continued discharges from the Hyperion plant on compliance by the city with a schedule designed to achieve full secondary treatment of wastewater by October 1, 1979, and the gradual elimination of the discharge of sludge into the ocean over a 30-month period following "concept approval" of a plan for alternative disposal of the sludge. *Id.,* at 17–19.[6]

In July 1976, the EPA notified Los Angeles that its 1975 NPDES permit would expire on February 1, 1977, and that a new permit would be needed if discharges were to continue beyond that date. Record 44. The city filed an application for a new permit on July 30. *Id.,* at 45–80. Thereafter, in September 1976, the CRWQCB suggested to the EPA that the city's current permit might be extended for six months to take into account any effect of pending federal legislation that would modify the FWPCA's mandatory compliance dates

---

[6] On December 1, 1975, the CRWQCB issued an order modifying the city's compliance schedule for alternative sludge disposal. That order announced that "concept approval" had been given on October 1, 1975, and fixed definite dates for achieving the elimination of sludge discharge into the ocean. Total "sludge-out" was to be achieved by April 1, 1978. App. 51. In subsequent orders, the CRWQCB found that the city had failed to meet several deadlines for the submission of plans and specifications for various phases of the sludge discharge elimination project. The CRWQCB then modified the relevant compliance dates, and extended the deadline for total "sludge-out" to April 1, 1980. *Id.,* at 57. The city has taken the position in this litigation that the CRWQCB's extension of the deadline for total "sludge-out" has been incorporated within the compliance schedule of the Hyperion plant's federal permit as well. See *infra,* at 218–219.

for achievement of effluent limitations based upon secondary treatment. *Id.*, at 119. See n. 4, *supra*. On January 24, 1977, after a public hearing, the EPA and the CRWQCB did extend the expiration date of the 1975 permit from February 1 to June 30, 1977, citing inadequate time to review the city's application for a new permit. App. 93.[7]

---

[7] In the meantime, a significant public controversy had developed concerning the EPA's approval of the city's alternative sludge disposal project. That project, to be funded by construction grants awarded under Title II of the FWPCA, 86 Stat. 833, 33 U. S. C. § 1281 *et seq.* (1976 ed. and Supp. II), has been referred to as the Hyperion Treatment Plant Interim Sludge Disposal Project. (The parties, commendably, have refrained from referring to this project as the HTPISDP, and so shall we.) The project called for the implementation of a process at the plant by which the digested sludge would be dewatered, formed into cakes, and hauled by truck to a sanitary landfill in Palos Verdes. An environmental impact appraisal developed by the EPA has estimated that when the trucking project is fully operational it will require 255 round trips per week over a distance of 42 miles. The city of Los Angeles and its Chamber of Commerce opposed the project, and objected when the EPA decided to fund it without preparing and evaluating an environmental impact statement (EIS), which they alleged to be required under the National Environmental Policy Act of 1969 (NEPA), 83 Stat. 852, 42 U. S. C. § 4321 *et seq.* App. 63. Respondent Pacific Legal Foundation (PLF) also objected. It requested the EPA to suspend those conditions on the city's NPDES permit that required it to cease ocean discharge of sewage sludge from the Hyperion plant. This request was based on PLF's interpretation of the requirements of the FWPCA with respect to the discharge of pollutants into the oceans. The PLF argued that § 403 of the FWPCA, 86 Stat. 883, 33 U. S. C. § 1343, required the EPA to perform a full environmental analysis of the effects on the ocean of the cessation of sludge discharge from the Hyperion plant, as well as the economic and social costs that would be involved in replacing ocean discharge with the landfill project. App. 84. The Regional Administrator of the EPA denied the PLF's request on January 31, 1977, taking the view that the FWPCA required all publicly owned treatment works to achieve effluent limitations based upon secondary treatment by July 1, 1977, and that this requirement mandated that the Hyperion plant cease the discharge of sewage sludge into the ocean. The Regional Administrator also noted that the conditions placed upon the 1975 permit had not been challenged during

On April 26, 1977, the EPA advised the city that it again proposed to extend the expiration date of its NPDES permit for the Hyperion plant, this time from June 30, 1977, to December 17, 1979.[8]  All other terms and conditions of the

the public hearings that preceded its issuance, and that no interested party had requested an adjudicatory hearing concerning those conditions. He therefore refused to reopen consideration of the 1975 permit. *Id.*, at 89. By the time of the Regional Administrator's response to the PLF, the city's permit already had been extended to June 30, 1977.

The PLF then attempted, unsuccessfully, to prevent the EPA from funding the Interim Sludge Disposal Project without preparing an EIS on its decision to do so. See *Pacific Legal Foundation* v. *Quarles*, 440 F. Supp. 316 (CD Cal. 1977), appeal docketed, No. 77–3844 (CA9). Subsequent to the District Court's decision in *Quarles*, however, the EPA voluntarily agreed to prepare an EIS on the project's funding. Brief for Petitioner 15, n. 12.

Still another PLF lawsuit relating to the Hyperion permit and its "sludge-out" schedule is pending. In that action the PLF has sued officials of the EPA and the Department of the Interior claiming that those agencies have failed to carry out their statutory obligations under the Endangered Species Act of 1973, 87 Stat. 884, 16 U. S. C. § 1531 *et seq.*, in approving the alternative sludge disposal project. The PLF contends that the elimination of sludge discharge into the ocean will adversely affect the food chain that supports the existence of gray whales and brown pelicans, and that trucks going to and from the landfill site will kill the El Segundo butterfly. Brief for Petitioner 15, n. 12. The District Court granted the PLF's motion for partial summary judgment on its contention that the agencies had not fulfilled their statutory obligation, and has required the EPA to consider, during the course of the hearing ordered by the Court of Appeals in this case, the effects of the permit's "sludge-out" schedule on endangered species. *Pacific Legal Foundation* v. *Andrus*, Civ. No. C–78–3464–AAH(SX) (CD Cal. May 8, 1979), appeals docketed, Nos. 79–3472, 79–3566, 79–3661 (CA9).

We, of course, express no view on the merits of these related PLF challenges to the Hyperion permit's compliance schedules.

[8] The Administrator of the EPA has the authority to issue NPDES permits "for fixed terms not exceeding five years." §§ 402 (a)(3), (b)(1)(B), 86 Stat. 880, 881, 33 U. S. C. §§ 1342 (a)(3), (b)(1)(B) (1976 ed. and Supp. II). The respondents have not challenged the substantive authority of the Administrator to extend the expiration of a per-

permit were to remain unchanged. App. 115–120. Notice of the proposed action was published in the Los Angeles Times the following day. See L. A. Times, Apr. 27, 1977, part V, p. 2, cols. 6–7. That notice described the permit and its proposed modification, and advised persons wishing to comment upon objections or to appear at a public hearing to submit their comments or requests for a hearing to the regional office of the EPA within 30 days. Neither the city nor the respondent PLF, nor any other party, requested a hearing or filed comments on the proposed extension, and the EPA's Regional Administrator determined that public interest in the modification proposal was insufficient to warrant convening a public hearing. On May 23, at a public hearing, the CRWQCB officially extended the expiration date of the state permit for the Hyperion plant until December 17, 1979. App. 154. On June 2, 1977, the Regional Administrator of the EPA transmitted to the city his final determination to extend the time of expiration of the federal permit to the same 1979 date. *Id.*, at 149.

On June 10, 1977, the PLF filed a Freedom of Information Act request with the regional enforcement division of the EPA, seeking information concerning the proposed extension of the expiration date of the Hyperion permit and, specifically, whether that extension had been approved. *Id.*, at 157. When informed by telephone on June 13 that the EPA's final determination had been made on June 2, and that a request for an adjudicatory hearing could be accepted only if filed that day, see 40 CFR § 125.36 (b)(1), respondent Kilroy, represented by PLF attorneys, filed such a request. Under EPA regulations, Kilroy's request for a hearing, if granted, would automatically stay the effectiveness of the permit modification pending disposition of the request. § 125.35 (d)(2).

---

mit to a date within five years of its initial issuance, so long as such permit modification is implemented in accordance with applicable procedural requirements.

Respondent Kilroy's request for an adjudicatory hearing presented two issues that he wished to raise:

"1. Whether the requirements of the permit should be modified in that the project that is the subject of the compliance schedule set forth in NPDES permit CA010991 · [the Hyperion permit] is being evaluated in an EIS by the EPA pursuant to the requirements of NEPA, the compliance schedule should not be mandated in an NPDES permit until .the NEPA study is completed; and

"2. Whether the procedures used and the record developed were adequate [for the] issuance of an NPDES permit." App. 160.

Within 10 days of receiving Kilroy's request, the Regional Administrator responded by certified mail, stating his determination that the request did not set forth material issues of fact relevant to the question whether the permit should be extended. Thus, he concluded that Kilroy's request had not met the requirements of 40 CFR § 125.36 (c)(1)(ii). The Regional Administrator did construe the request, however, as one raising issues of law relating to the appropriate interpretation to be given regulations that had been promulgated under the FWPCA. He therefore certified to the EPA's General Counsel three issues of law raised by the request. App. 166.[9] Before the General Counsel's ruling

---

[9] The following were the issues of law certified by the Regional Administrator to the General Counsel:

"1. Must EPA conduct an informal public hearing prior to taking action to extend the expiration date of an NPDES permit where public notice of the proposed action was published more than 30 days in advance of the action?

"2. Must a detailed factual record be developed prior to modification of an NPDES permit where the only modification made to the permit is the extension of the permit's expiration date?

"3. May the expiration date of an NPDES permit be extended where a project covered by the compliance schedule is being evaluated by EPA

on the certified issues of law was announced, respondents PLF and Kilroy, joined now by the city of Torrance, theretofore a stranger to the formal proceedings, filed a timely petition with the United States Court of Appeals for the Ninth Circuit seeking review of the Regional Administrator's action extending the expiration date of the Hyperion permit. A similar petition was filed by respondent city of Los Angeles. The petitions were consolidated for review. The Court of Appeals stayed the effect of the compliance schedules incorporated within the 1975 permit, pending final disposition of the consolidated cases. Even though the city's NPDES permit for the Hyperion plant, as modified by the EPA on June 2, 1977, stated that it expired December 17, 1979, the terms of the permit, other than those aspects of the compliance schedules requiring completion after January 1, 1977, have remained in effect, both through the Court of Appeals' stay and by operation of law.[10] The case, therefore, clearly has not become moot.

---

in an Environmental Impact Statement for the purpose of determining whether a grant should be made to assist in the construction of the project?" App. 168.

Following the parties' presentation of written briefs on these and related issues, the General Counsel ruled against respondent Kilroy. She concluded that the EPA has the authority to extend the expiration date of an NPDES permit through modification, and that an opportunity for a public hearing on such a modification must be provided. A hearing is to be held, however, only if the Regional Administrator finds a significant degree of public interest in the proposed modification. The General Counsel refrained from addressing the second certified issue because Kilroy's brief did not challenge specifically the adequacy of the record supporting the permit modification. Finally, she ruled that the EPA has the authority to extend the expiration date of a permit requiring the implementation of a project, even though funding for that project is undergoing evaluation in an EIS. The General Counsel relied on the District Court's decision in *Pacific Legal Foundation* v. *Quarles,* see n. 7, *supra,* as support for the latter ruling. App. 194.

[10] The Court of Appeals in December 1977 stayed the compliance schedules incorporated within the Hyperion plant's NPDES permit pend-

## IV

The Court of Appeals remanded the matter to the Administrator for the holding of a "proper hearing." 586 F. 2d 650, 660–661 (CA9 1978). After first determining that it had jurisdiction to hear respondents' petitions, and rejecting Los Angeles' argument that only the State of California had the authority to extend the Hyperion NPDES permit, *id.*, at 654–657, the court held that the EPA had failed to provide the "opportunity for public hearing" required by § 402 (a)(1) when it extended that permit. All parties agreed that the EPA had not in fact conducted a hearing prior to its extension of the permit on June 2, 1977. The EPA contended, however, that an *opportunity* for a hearing had been provided; it claimed that notice of the proposed extension had been published and that, when no one requested a hearing, it was proper under agency regulations for the Regional Administrator to conclude that there was insufficient public interest in the permit extension to necessitate a hearing. See 40 CFR § 125.34 (a). The Court of Appeals rejected the EPA's contention, holding:

> "The fact that no one requested a hearing prior to the decision is appropriately considered in this analysis, but it is not decisive. It must be shown that the material facts supporting the decision are not subject to dispute." 586 F. 2d, at 658–659 (footnotes omitted).

---

ing proceedings on remand to the EPA. The effluent limitations that were in effect on January 1, 1977, however, as well as the permit's monitoring and reporting requirements, have remained operative pending final resolution of this dispute. 586 F. 2d 650, 660–661 (CA9 1978). Because the EPA has not yet acted upon the city's application, filed July 30, 1976, for a new NPDES permit, the terms and conditions of the 1975 permit have remained in effect by operation of law, even though the permit expiration date has now passed. See 5 U. S. C. § 558 (c) (a federal license with reference to an activity of a continuing nature does not expire until a timely application for renewal thereof has been finally determined by the pertinent agency); Tr. of Oral Arg. 4.

The court also relied on language in *Independent Bankers Assn.* v. *Board of Governors,* 170 U. S. App. D. C. 278, 516 F. 2d 1206 (1975), to the effect that certain "opportunity for hearing" requirements of the Bank Holding Company Act of 1956, as amended, 84 Stat. 1765, 12 U. S. C. § 1843 (c)(8), required the Board of Governors of the Federal Reserve System to hold an evidentiary hearing unless it could "show that the parties could gain nothing thereby, because they disputed none of the material facts upon which the agency's decision could rest." 170 U. S. App. D. C., at 292, 516 F. 2d, at 1220.

The Court of Appeals distinguished decisions of this Court in which it was held that a failure to request a hearing constituted a waiver of any right thereto under the Federal Coal Mine Health and Safety Act of 1969, 83 Stat. 742, 30 U. S. C. § 801 *et seq.,* and that an agency may place the burden of demonstrating that a case presents disputed issues of material fact on the party challenging the agency's action. 586 F. 2d, at 658–659, nn. 3 and 4 (discussing *National Coal Operators' Assn.* v. *Kleppe,* 423 U. S. 388, 397–398 (1976); *Weinberger* v. *Hynson, Westcott & Dunning, Inc.,* 412 U. S. 609, 620 (1973); and *United States* v. *Storer Broadcasting Co.,* 351 U. S. 192, 205 (1956)).

On the record before it, the Court of Appeals concluded that "the reasonableness of the EPA's compliance schedule [incorporated within the Hyperion NPDES permit] depends upon facts that may be disputed and with respect to which the record in this case is silent." 586 F. 2d, at 659. With respect to such factors as the adequacy of the Palos Verdes or other landfill site, the ability of the city to acquire the capacity to transport sludge to that site within designated time limits, and the possible effect on navigable waters of land disposal of the sludge, the court stated: "[W]e can conclude unequivocally neither that the parties have no dispute about these matters nor that they do." *Ibid.* Thus, the court found itself unable to deny respondents an adjudicatory hearing on the ground that there was no dispute concerning the

material facts upon which the EPA's decision to extend the permit had been based.

The Administrator of the EPA petitioned .this Court for review of the question whether § 402 (a)(1) requires the EPA to conduct an adjudicatory hearing before taking action on an NPDES permit issuance or modification where, after notice of the proposed action, no one requested a hearing before the action was taken and the only request filed subsequently raised no material issue of fact.[11]  We granted certiorari to review this important issue in a rapidly developing area of the law. 442 U. S. 928 (1979).

## V

## A

Petitioner's basic contentions are that the .EPA was entitled to condition the availability of a public hearing on the extension of the Hyperion permit on the filing of a proper request, and that it similarly was entitled to condition an adjudicatory hearing following its extension decision on the identification of a disputed issue of material fact by an interested party. We agree with both contentions.

Initially, we must state our disagreement with respondents' characterization of the holding of the Court of Appeals.  They argue that the court's decision was based on a finding that the EPA in this case did not comply with its own regulations governing public participation in the NPDES permit issuance process, rather than on a legal conclusion that the regulations

---

[11] Respondents PLF and Kilroy suggest that the writ of certiorari should be dismissed as having been improvidently granted because petitioner has inserted issues in his brief on the merits that were not included within the question presented in his petition for certiorari. We decline the invitation to dismiss the writ.  We note, however, that a decision in this case does not require us to resolve petitioner's contention, challenged by respondents as a "new issue," that Congress did not intend adjudicatory hearings under § 402 of the FWPCA to be governed by the formal requirements of an adjudication "on the record" set forth in the Administrative Procedure Act, 5 U. S. C. § 554 (1976 ed. and Supp. II).

are invalid. We conclude, on the contrary, that, although the court did not explicitly hold the regulations to be invalid, its decision renders them essentially meaningless. Rather than permitting the Regional Administrator to decide, in the first instance, whether there is sufficient public interest in a proposed issuance or modification of a permit to justify a public hearing, 40 CFR § 125.34 (a), and to limit any adjudicatory hearing to the situation where an interested party raises a material issue of fact, § 125.36 (c) (1) (ii), the Court of Appeals would require the agency to justify every failure to hold a hearing by proof that the material facts supporting its action "are not subject to dispute." 586 F. 2d, at 659. This holding is contrary to this Court's approval in past decisions of agency rules, similar to those at issue here, that have required an applicant who seeks a hearing to meet a threshold burden of tendering evidence suggesting the need for a hearing. See, e. g., *Weinberger* v. *Hynson, Westcott & Dunning, Inc.,* 412 U. S., at 620–621, and cases cited therein.

Moreover, it is important to note that the regulations described in Part II of this opinion, *supra,* were designed to implement the statutory command that permits be issued "after *opportunity* for public hearing." § 402 (a) (1), 86 Stat. 880, 33 U. S. C. § 1342 (a) (1) (emphasis supplied). In the past, this Court has held that a similar statutory requirement that an "opportunity" for a hearing be provided may be keyed to a *request* for a hearing. See *National Coal Operators' Assn.* v. *Kleppe,* 423 U. S., at 398–399.[12] And only recently

---

[12] To the extent the Court of Appeals' holding to the contrary relied upon the decision in *Independent Bankers Assn.* v. *Board of Governors,* 170 U. S. App. D. C. 278, 516 F. 2d 1206 (1975), such reliance was misplaced. The passage from that opinion relied upon by the Court of Appeals itself demonstrates that the decision stands for the proposition that a party waives its right to an adjudicatory hearing where it fails to dispute the material facts upon which the agency's decision rests. See *supra,* at 212.

the Court re-emphasized the fundamental administrative law principle that "the formulation of procedures was basically to be left within the discretion of the agencies to which Congress had confided the responsibility for substantive judgments." *Vermont Yankee Nuclear Power Corp.* v. *NRDC,* 435 U. S. 519, 524 (1978).

Neither can we ignore the fact that under the standard applied by the Court of Appeals, the EPA would be required to hold hearings on most of the actions it takes with respect to NPDES permit issuances and modifications. Hearings would be required even in cases, such as this, in which the proposed action only extends a permit's expiration date without at all affecting the substantive conditions that had been considered during earlier hearings. The Administrator advises us that each year the EPA grants about 100 requests for adjudicatory hearings under the NPDES program, issues about 2,200 permits, and takes thousands of actions with respect to permits. Brief for Petitioner 34–35; see *United States Steel Corp.* v. *Train,* 556 F. 2d 822, 834, n. 14 (CA7 1977). Affirmance of the Court of Appeals' rationale obviously would raise serious questions about the EPA's ability to administer the NPDES program. See *Weinberger,* 412 U. S., at 621; *E. I. du Pont de Nemours & Co.* v. *Train,* 430 U. S. 112, 132–133 (1977).

We recognize the validity of respondents' contention that the legislative history of the FWPCA indicates a strong congressional desire that the public have input in decisions concerning the elimination of water pollution. The FWPCA itself recites:

> "Public participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established by the Administrator . . . under this Act shall be provided for, encouraged, and assisted by the Administrator." § 101 (e), 86 Stat. 817, 33 U. S. C. § 1251 (e).

Passages in the FWPCA's legislative history indicate that this general policy of encouraging public participation is applicable to the administration of the NPDES permit program. See, *e. g.*, 118 Cong. Rec. 37060 (1972) (remarks of Rep. Dingell during debate on override of the President's veto of the FWPCA). The Report of the Committee on Public Works accompanying the Senate bill emphasized that an essential element of the NPDES program is public participation, and that "[t]he public must have a genuine opportunity to speak on the issue of protection of its waters." S. Rep. No. 92–414, p. 72 (1971).

Nonetheless, we conclude that the regulations the EPA has promulgated to implement this congressional policy are fully consistent with the legislative purpose, and are valid. Respondents, in fact, do not contest seriously the proposition that the EPA's regulations are valid on their face; the thrust of their arguments before this Court has been that the EPA, in this instance, failed to apply its regulations consistently with their purpose.

### B

Having rejected the Court of Appeals' invalidation of the EPA's public participation regulations, we turn to the issues framed by respondents. First, PLF and Kilroy contend that the EPA's regulations required the Regional Administrator to hold a public hearing in this case because there was a "significant degree of public interest" in the extension of the Hyperion permit. See 40 CFR § 125.34 (a). They also place substantial reliance upon those agency regulations that set general guidelines for public participation in water pollution control. During the period at issue here, one such regulation provided:

> "Where the opportunity for public hearing is called for in the Act, and in other appropriate instances, a public hearing shall be held if the hearing official finds significant public interest (including the filing of requests or

petitions for such hearing) or pertinent information to be gained. Instances of doubt should be resolved in favor of holding the hearing, or if necessary, of providing alternative opportunity for public participation." 40 CFR § 105.7 (c).

Notwithstanding the orientation of these regulations toward the encouragement of public participation in the NPDES permit issuance process, our examination of the record leads us to reject respondents' contention that the EPA failed to comply with its regulations in this case. It is undisputed that the most controversial aspects of the Hyperion permit—the compliance schedule for secondary treatment, the "sludge-out" requirement, and the resultant requirement that the city develop an alternative method of sludge disposal—were all included within the 1975 permit. That permit was issued following EPA publication of advance notice of its tentative determination to revise the initial 1974 permit, and a hearing on the proposed revisions. None of the respondents objected to the issuance of the 1975 permit or requested an adjudicatory hearing. We agree with the position advanced by petitioner that respondents may not reopen consideration of substantive conditions contained within the 1975 permit through hearing requests relating to a proposed permit modification that did not even purport to affect those conditions.

The EPA's determination to modify the 1975 permit by extending its expiration date to December 17, 1979, was made following newspaper publication of the proposed action, including notice of an opportunity for submission of comments and hearing requests. Respondent Los Angeles received an individual notice of the EPA's tentative determination to extend the permit, and raised no objection. Respondents PLF and Kilroy, who argue that the EPA was aware of their interest in the Hyperion permit and their opposition to the Interim Sludge Disposal Project, could have received such individual notice if they had asked to be placed on the EPA's

mailing list for notices of proposed agency actions within the pertinent geographical area. 40 CFR § 125.32 (a)(3). They made no such request. Under the circumstances, we think it reasonable that the Regional Administrator decided to extend the expiration date of the permit without another public hearing, on the grounds that the public had not exhibited a significant degree of interest in the action under consideration, and that information pertinent to such a decision would not have been adduced if a hearing had been held. This simply is not a case in which doubt existed concerning the need for a hearing.

Second, respondents suggest that the EPA's provision of notice to the general public concerning the proposed permit extension was inadequate. The PLF and Kilroy argue that notice by newspaper publication was not adequate to apprise interested parties of the EPA's tentative determination, and was inconsistent with the policy of encouraging public participation that underlies the statute and regulations. Based on our conclusion that the EPA's regulations implementing the rather amorphous "opportunity for public hearing" requirement of § 402 are valid, we have no hesitancy in concluding that the form of notice provided in this case, fully consistent with the regulations, was not inadequate.

Los Angeles argues that it was not given adequate notice of the proposed extension of its permit because it was never informed that the EPA regarded the federal "sludge-out" compliance schedule contained in the 1975 permit not to have been modified by subsequent orders of the CRWQCB. See n. 6, *supra.* This argument was not addressed directly by the Court of Appeals. It would be appropriate, therefore, for this Court not to attempt to resolve it here, even if we had an adequate record to do so. More fundamentally, however, an additional reason dictates that the city's argument not be resolved in the context of this lawsuit at all. Los Angeles claims that the more lenient sludge-out schedule adopted by

the CRWQCB in its order of May 24, 1976 (incorporating within the Hyperion permit a four-phase alternative sludge disposal plan to be completed by April 1, 1980) has been approved by the EPA with respect to the federal permit. The EPA presently takes the position that state modifications of the sludge-out plan, adopted pursuant to California law, did not alter the initial compliance schedule incorporated in the 1975 federal permit. The agency's position will be tested in *United States* v. *City of Los Angeles,* No. CV 77 3047 R (CD Cal., filed Aug. 12, 1977), an enforcement action brought by the Government under § 309 of the FWPCA, 86 Stat. 859, 33 U. S. C. § 1319 (1976 ed. and Supp. II).

The enforcement action seeks to enjoin the city from violating the conditions of its permit and to impose civil penalties against the city for past failures to comply with the permit's schedules. App. 181. It has been stayed by the Court of Appeals pending the outcome of this case. Brief for Petitioner 17, n. 13. The argument that the city raises here concerning its understanding of the compliance schedules will be resolved far more effectively in the Government's enforcement action than in the adjudicatory hearing the Court of Appeals would have awarded respondents in this case.[13] Furthermore, even if the city had raised its argument in a public hearing on the proposed permit extension, that argument would have had little relevance to the EPA's final determination because the EPA's proposed action did not purport to change the substantive conditions that are the focus of the city's complaint.

Finally, respondents suggest that the EPA erred in not holding an adjudicatory hearing on the issues raised in respondent Kilroy's request. We agree with petitioner, however, who contends that Kilroy's request raised legal, rather

---

[13] The Court of Appeals' stay of the compliance schedules incorporated within the 1975 permit did not remove the basis for the Government's enforcement action. That action challenges several alleged violations of the Hyperion NPDES permit that predated January 1, 1977. App. 183–187. See n. 10, *supra.*

than factual, issues, and who notes that respondents treated the request in that fashion in arguing the issues Kilroy presented before the EPA's General Counsel. See n. 9, *supra*. Even in their arguments before this Court, respondents have continued to raise factual issues that are relevant only to their contention that greater adverse effects on both the marine and land environment will result from the Interim Sludge Disposal Project than from the continued discharge of sludge into the ocean. If such issues had been raised in a timely request for an adjudicatory hearing, we agree with petitioner that the EPA could have taken the position that such issues, regardless of their merits, were not pertinent to a determination to extend the Hyperion permit's expiration date. That determination had no impact on the compliance schedule for "sludge-out" that already had long been in effect.[14]

## C

In sum, we hold that the Court of Appeals erred in concluding that the EPA is required to hold a public hearing on every NPDES permit action it takes unless it can show that the material facts supporting its action "are not subject to

---

[14] Respondents' litigation strategy throughout the proceedings culminating in this opinion seems to have been based, at least in part, on a fear that the EPA may evade further public scrutiny of the compliance schedules incorporated within the 1975 NPDES permit by issuing continued extensions of that permit rather than acting upon the city's application for a new permit. See *supra*, at 205–206. If that potential for evasion ever did exist, it was a limited one. Under § 402 (b) (1) (B) of the FWPCA, the EPA could have set the expiration date for the initial 1975 permit as late as August 1980, and the agency actions that culminated in this lawsuit would have been unnecessary. Now that the outside date for extensions of the 1975 permit is approaching, any additional extension for purposes of avoiding further hearings on the permit's compliance schedules would have little practical impact. We note, as well, that Los Angeles, under the Administrative Procedure Act, 5 U. S. C. § 706 (1) (a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed") may obtain judicial review of prolonged agency inaction with respect to its application for a new permit.

dispute." We hold, rather, that the agency's regulations implementing the statutory requirement of "an opportunity for public hearing" under § 402 of the FWPCA are valid. Respondents have failed to demonstrate that those regulations were not applied properly in the context of this case. The Court of Appeals' judgment remanding the case to the agency for an adjudicatory hearing on the EPA's extension of the expiration date of Los Angeles' NPDES permit for its Hyperion Wastewater Treatment Plant is reversed.

*It is so ordered.*