Revised November 16, 2000

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 99-60694

NEWELL RECYCLING COMPANY, INC.,

Petitioner,

VERSUS

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent.

On Petition For Review of a Final Order of the
Environmental Protection Agency

November 8, 2000

Before DUHÉ, EMILIO M. GARZA and DeMOSS, Circuit Judges.

DUHÉ, Circuit Judge.

Newell Recycling Company, Inc. ("Newell") appeals a final decision of the Environmental Protection Agency's Environmental Appeals Board ("EAB") holding Newell liable for violating the disposal requirements for polychlorinated biphenyls ("PCBs") established in Section 6(e) of the Toxic Substances Control Act ("TSCA"). The EAB's decision penalized Newell $1.345 million, less an amount paid in settlement by a co-defendant, for violating the TSCA. For the following reasons, we affirm.

BACKGROUND

Newell owned and operated a recycling facility in Houston, Texas, during the 1970's and early 1980's. In 1982, Newell sold the facility to Oklahoma Metal Processing, Inc. d/b/a Houston Metal Processing Company ("HMPC"). In the sale, Newell agreed to "specifically assume any liability resulting from an occurrence prior to the closing date of this sale."

Within two years of the sale, the Texas Department of Health sought soil samples to verify its suspicions of lead contamination at the recycling facility site. Shortly thereafter, Newell Enterprises asked HMPC to authorize Newell Recycling Company, Inc. (i.e., "Newell," the Petitioner in this case), Newell Products of Houston, Inc., and Newell Industries, Inc., to commence testing for lead contamination and cleanup on the site. After the soil samples showed lead contamination, a consultant recommended to Newell that the contaminated soil be removed to a hazardous waste facility for disposal. The consultant noted that HMPC had authorized Newell to perform testing, cleanup, and soil transportation functions at the site.

While superintending lead cleanup operations there in 1985, Newell discovered the PCB contamination that this case concerns. Electric capacitors seeping PCB-contaminated fluids lay buried in the soil unearthed during the lead contamination cleanup. Newell – although advised repeatedly by another consultant it had hired that the PCB-contaminated soil piled at the site had to be treated

or disposed of by methods acceptable to the EPA under the TSCA – waited until after the EPA filed an administrative complaint against it in 1995 for violating the TSCA to remove the soil to a disposal facility. Approximately ten years elapsed, then, from Newell's discovery of the buried capacitors in 1985 to its proper disposal of the PCB-contaminated soil pile in 1995. The record does not explain this delay.

The Presiding Officer granted the EPA an accelerated decision (the equivalent of summary judgment) on its administrative complaint, holding that Newell committed an act of improper disposal by knowingly causing PCB-contaminated soil to be excavated and stockpiled at the site and then "leaving [the soil] there and taking no further clean-up action." In re Oklahoma Metal Processing Co., Inc., No. VI-659C (EPA April 29, 1997) (order granting partial accelerated decision on issue of liability). The Presiding Officer assessed Newell a $1.345 million fine for the disposal violation, less the amount HMPC paid the EPA to settle an action regarding its role in the improper disposal at the site. Newell appealed the Presiding Officer's liability rulings and his penalty assessment decision to the EAB. It affirmed the Presiding Officer's decision. Newell appeals the EAB's decision.

Newell argues that a five-year statute of limitations barred the EPA's TSCA complaint, that on the merits Newell is not liable for an "improper disposal" under the TSCA, and that the Presiding Officer's application of the EPA's 1990 Polychlorinated Biphenyls

3

Penalty Policy (the "Penalty Policy") generated an excessive penalty that violated Newell's constitutional rights.

DISCUSSION

We must affirm the EAB's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). See also Amoco Production Co. v. Lujan, 877 F.2d 1243, 1248 (5th Cir. 1989) ("On review of an agency adjudication, . . . the reviewing court must in general affirm the decision unless the agency's action was arbitrary, capricious, or otherwise not in accordance with law").

I.   Limitations

28 U.S.C. § 2462 supplies the statute of limitations applicable here:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years of the date when the claim first accrued. . . .

Newell argues that the EPA's improper disposal claim "accrued" when the PCBs polluting the soil pile were "taken out of service." See 40 C.F.R. § 761.3 ("Disposal means intentionally or accidentally to discard, throw away, or otherwise complete or terminate the useful life of PCBs and PCB Items. Disposal includes spills, leaks, and other uncontrolled discharges of PCBs as well as actions related to containing, transporting, destroying, degrading, decontaminating, or confining PCBs and PCB Items"). Since, Newell asserts, the PCBs

4

were "taken out of service" sometime before 1990, the EPA's claim accrued more than five years before the filing of its TSCA complaint against Newell in 1995 and is thus time-barred. The EPA argues that Newell's TSCA violation -- excavating and stockpiling the soil and then leaving it on the site for ten years before disposing of it in accordance with 40 C.F.R. § 761.60(a), which requires that soil contaminated with PCBs above a certain ppm threshold be disposed of in an EPA-approved incinerator or landfill -- was "continuing" in nature. See InterAmericas Investments, Ltd. v. Board of Governors of the Federal Reserve System, 111 F.3d 376, 382 (5th Cir. 1997) ("A continuing violation applies when the conduct is ongoing, rather than a single event"). The EAB agreed with the EPA. The EAB held that the EPA's TSCA cause of action against Newell did not accrue until the course of conduct complained of no longer continued. See Fiswick v. United States, 329 U.S. 211, 216 (1946) (statute of limitations for continuing offenses runs from the last day of the continuing offense); In re Standard Scrap, TSCA Appeal No. 87-4, 3 E.A.D. 267, 1997 WL 603524, at *2 (EAB Aug. 2, 1990) (Final Decision) ("Failure to [properly dispose of PCBs] constitutes a violation of the regulation, and the violation continues as long as the PCBs remain out of service and in a state of improper disposal"). That is, it did not accrue until 1995, when Newell properly disposed of the soil. If stockpiling the soil was a disposal, we cannot say the EAB's conclusion was arbitrary, capricious, an abuse of discretion or

5

otherwise not in accordance with law.[1]  Because we hold that the EPA's TSCA cause of action against Newell did not accrue for limitations purposes until 1995, we also affirm the EAB's denial of Newell's request for additional discovery.  This discovery, Newell claims, would establish that the EPA had actual notice of conditions at the site earlier than five years before the EPA filed its complaint.  Information about when the EPA actually knew of the site's conditions is not "significant[ly] probative" of any fact relevant to our statute of limitations determination.  <u>See</u> 40 C.F.R. § 22.19(f).

II.  Liability

Newell challenges its TSCA liability on two grounds.  First, Newell argues that the EAB erroneously held that Newell contributed to the creation of the PCB-contaminated soil pile.  Second, Newell contends that if, *arguendo*, it did cause the creation of the soil pile, that act of creation and Newell's subsequent involvement with the pile did not constitute an improper disposal of PCBs within the meaning of the TSCA.

The EAB properly determined that Newell contributed to the creation of the soil pile.  The PCB Rule of the TSCA extends civil penalty liability to any "person who violates these regulations." 40 C.F.R. § 761.1(d).  "Violators" in this context are those who have "caused (or contributed to the cause of) the [improper]

---

[1]<u>See</u> discussion of disposal that follows.

6

disposal." In re City of Detroit, 3 E.A.D. 514, 526 (CJO 1991).

Ample evidence indicates that Newell at least contributed to the creation of the soil pile. Newell contends that a Newell affiliate, not Newell itself, created the pile. The record suggests otherwise. The EAB aptly characterized its contents: Newell "may not have acted alone, but it was certainly an active party in the events constituting the TSCA violation." Newell Recycling Co., Inc. v. United States Environmental Protection Agency, TSCA Appeal No. 97-7, slip op. at 33 (EAB Sept. 13, 1999). Newell, and not one of its affiliates, owned the Fidelity Road site immediately before conveying it to HMPC. In the sale of the site Newell assumed liability for "occurrence[s] prior to the closing date of th[e] sale." This covenant produced Newell's extensive involvement in remedying the lead and PCB contamination at the site. Newell's involvement included, the EAB correctly found: a visit by Newell's owner, Alton Newell, to the site in response to HMPC's demand for remedial action; Newell's two-time (1987 and 1989-90) retention of an environmental consulting firm to recommend remedies for PCB contamination at the site; execution in 1987 of an agreement with HMPC and another party interested in the site tolling the statute of limitations on claims against Newell arising from the site's contamination; and Newell's removal in 1995 of the contaminated soil to a disposal facility at its own expense. Moreover, until this enforcement action, Newell never suggested to the Texas or federal authorities involved in decontamination of the

7

site that some other Newell entity was responsible for the contaminated soil pile.

In view of these facts, the EAB's determination that Newell contributed to the creation of the soil pile was not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

Newell, however, argues that if it contributed to the creation of the soil pile, its contribution was not an improper disposal under the TSCA. Newell argues that PCB disposal is a one-time event occurring, in a case like this one, only when capacitors containing PCBs are buried and their contents released into the surrounding soil. Because, Newell contends, there is no evidence implicating Newell in the original disposal of the capacitors, the EPA failed to establish that Newell improperly disposed of PCBs. The EAB rejected this argument, noting that Newell's interpretation of "disposal" would have "no TSCA liability . . . attach even if Newell had taken the pile of contaminated soil from the Fidelity Road site and dumped it into the nearest river, stream, or vacant lot." Newell Recycling Co., Inc. v. United States Environmental Protection Agency, TSCA Appeal No. 97-7, slip op. at 29-30 (EAB Sept. 13, 1999). Such an interpretation, the EAB continued, would subvert the environmental protection goals of the TSCA regime. See In re Samsonite Corp., 3 E.A.D. 196, 199 (CJO 1990) (PCB regulations "should be read in such a way as to further the purposes of the Act, particularly where, as in this case, public

8

health and safety are involved"). At any rate, the EAB concluded, Newell's interpretation of "disposal" fails because it would effectively exclude what the textual definition of disposal cited above indisputably includes: activities undertaken to address known PCB contamination. See 40 C.F.R. § 761.3 ("[d]isposal includes spills, leaks, and other uncontrolled discharges as well as actions related to containing, transporting, destroying, degrading, decontaminating, or confining PCBs or PCB items"). The EAB determined that Newell's involvement with the soil pile, described above, fits this definition of "disposal." Newell Recycling Co., Inc. v. United States Environmental Protection Agency, TSCA Appeal No. 97-7, slip op. at 31 (EAB Sept. 13, 1999) ("The act of excavating and stockpiling PCB-contaminated soil at the Fidelity Road site is clearly in the nature of an action to 'contain,' 'transport,' and 'confine' PCBs. Moreover, leaving the stockpiled waste abandoned there for years is evidence that the PCB-contaminated soil was 'discarded' within the meaning of the rule").

We cannot say that this determination was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

III. Penalty

Because an agency's selection of an appropriate sanction to effect its policies is an act peculiarly within its institutional competence, our review of the penalty in this case is limited. See Wayne Cusimano, Inc. v. Block, 692 F.2d 1025, 1030 (5th Cir. 1982).

9

An agency's penalty determination "is reviewed with significant deference;" we will not reverse it unless it is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. InterAmericas Investments, Ltd., 111 F.3d at 384. Accordingly, although the penalty here strikes us as severe since there was no actual harm, we cannot disturb it.

The Penalty Policy limns a two-part process for PCB penalty assessment. First, the Penalty Policy requires the administrative law judge (the "Administrator") to examine the nature, circumstances, gravity and extent of the violation. Those factors suggest a gravity-based penalty. After the Administrator determines the gravity-based penalty, he or she considers (the second part of the process) the violator's ability to pay the penalty, the effect of the penalty on the violator's ability to continue to do business, the violator's history (if any) of such violations, the degree of culpability, and "such other matters as justice may require." POLYCHLORINATED BIPHENYLS (PCB) PENALTY POLICY (1990). The Administrator may adjust the gravity-based penalty in view of these factors.

A.   The Gravity-Based Penalty

The Penalty Policy makes the gravity-based penalty determination process mostly mechanical by pegging the above-described factors (the nature, circumstances, gravity and extent of

the violation[2]) to statistical benchmarks or fixed formulations. So, for example, the Presiding Officer did not err by concluding that the "extent" of Newell's violation was "major;" the Penalty Policy expressly defines violations involving more than 300 cubic feet of contaminated soil as "major," and the soil pile here was approximately 540 cubic feet in size. Id. Similarly, the Presiding Officer correctly characterized the "circumstances" of Newell's violation as "High Range, Level One" under the Penalty Policy.[3] The Penalty Policy states that "any disposal of PCBs or PCB Items in a manner that is not authorized by the PCB regulations" is automatically ranked "High Range, Level One." Id. Because discarding and abandoning PCB-contaminated soil in a pile is a disposal not authorized by the PCB regulations, the Presiding Officer rightly characterized Newell's as a "High Range, Level One" violation.

B. Adjustment of the Gravity-Based Penalty

The Presiding Officer may adjust the gravity-based penalty in view of the violator's ability to pay it, the effect the penalty might have on the violator's ability to continue to do business, the violator's history (if any) of prior such violations, the violator's degree of culpability, and such other matters as justice

---

[2] Newell challenges the Presiding Officer's treatment of the "circumstances" and "extent" factors, but not his treatment of the "nature" and "gravity" ones.

[3] The Penalty Policy ranks the "circumstances" of a violation as Low, Medium, or High Range, and subdivides each of these categories into two Levels.

may require. 15 U.S.C. § 2615(a)(2)(B). The "as justice may require" rubric includes whether the violator voluntarily disclosed the violation, any economic benefits the violator reaped from the violation, and any environmentally beneficial measures a violator may perform in exchange for penalty reduction. Newell argues that some of these factors counsel reduction of its penalty, and that the Presiding Officer's refusal to reduce it, in turn, was error.

### 1. Culpability

The Presiding Officer's determination that the "culpability" factor did not recommend mitigation of Newell's penalty was sound. The "two principal criteria" in the Penalty Policy for assessing culpability are: 1) the violator's knowledge of the particular requirement; and 2) the degree of the violator's control over the violative condition. POLYCHLORINATED BIPHENYLS (PCB) PENALTY POLICY (1990). As noted above, Newell knew the TSCA required more than the excavation and complete abandonment of the PCB-contaminated soil; Newell's environmental consultants repeatedly told Newell as much. Even though Newell did not own the property on which the soil lay, Newell had extensive control, described above, over the violative condition here. The record does not explain to our satisfaction why Newell waited years to properly dispose of the soil. The Presiding Officer, therefore, appropriately declined to mitigate Newell's penalty on culpability grounds.

### 2. Voluntary Disclosure

The Presiding Officer correctly declined to adjust the penalty

12

in view of Newell's alleged[4] voluntary disclosure of the TSCA violation. Newell waived this argument by failing to request in its submissions to the Presiding Officer a reduction in the penalty for voluntary disclosure. See In re Britton Construction Co., CWA Appeal Nos. 97-5 & 97-8, slip op. at 22-23 (EAB, Mar. 30, 1999), 8 E.A.D._ (under 40 C.F.R. § 22.30, appellant "may not appeal issues that were not raised before the presiding officer. As a result, arguments raised for the first time on appeal . . . are deemed waived") (citations omitted).

### 3. Ability to Pay / Continue to Do Business

The Penalty Policy requires the EPA to assume that an alleged TSCA violator has the ability to pay any fine assessed under the Penalty Policy and, therefore, to continue in business. POLYCHLORINATED BIPHENYLS (PCB) PENALTY POLICY (1990). The alleged TSCA violator may raise the issue of its ability to pay in its answer to the EPA's administrative complaint and "shall present sufficient documentation to permit the Agency to establish such inability." Id. If "the alleged violator fails to provide the necessary

---

[4] Waiver aside, nothing in the record indicates that Newell, in fact, voluntarily disclosed the violation here before the EPA initiated its TSCA action. Newell tacitly admits as much in its brief, but argues that the Presiding Officer erroneously denied Newell discovery that "would have provided conclusive evidence that the remediated soil pile was reported to the Texas Department of Health and to EPA [sic]." See Petitioner's Brief at 48. The EAB found this claim "a disingenuous proposition. If Newell had indeed made a voluntary disclosure, then, surely, Newell was in the best position to attest to it. Having failed to do so by affidavit in Response to the Region's motion for penalty assessment, Newell cannot credibly revive this argument on appeal." Newell Recycling Co., Inc. v. United States Environmental Protection Agency, TSCA Appeal No. 97-7, slip op. at 60 (EAB Sept. 13, 1999).

13

information, and the information is not readily available from other sources, then the violator will be presumed to be able to pay." Id. Newell's brief candidly states (and the Presiding Officer and EAB both held) that the record here features "a complete absence of evidence as to Newell's ability to pay and any effect on it's [sic] ability to do business." Petitioner's Brief at 39. Surely Newell was in possession of such information if anyone was. Nothing in the record, moreover, intimates that information regarding Newell's ability to pay is readily available from a source other than Newell. The Presiding Officer, therefore, correctly declined to mitigate the penalty on the basis of Newell's putative inability to pay it.

IV. Constitutional Concerns

Newell also argues that the penalty violated the Eighth Amendment's proscription of excessive fines and Newell's due process rights. Newell's constitutional claims fail.

A. Eighth Amendment Concerns

Newell's argument that the penalty is excessive,[5] and therefore a violation of its Eighth Amendment rights, is erroneous. Newell argues that the Excessive Fines Clause of the Eighth Amendment requires us to consider the value of its fine ($1.345

---

[5] Newell also argues that the penalty is excessive when compared to penalties in similar cases. The penalty here, however, need not resemble those assessed in similar cases. See Butz v. Glover Livestock Comm'n Co., 411 U.S. 182, 187 (1973) ("[t]he employment of a sanction within the authority of an administrative agency is . . . not rendered invalid in a particular case because it is more severe than sanctions imposed in other cases").

14

million) in relation to the magnitude of the offense inspiring it (Newell suggests that the $84,000 it paid to dispose of the soil accurately indicates the magnitude of its offense).  See U.S. CONST. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted").  No matter how excessive (in lay terms) an administrative fine may appear, if the fine does not exceed the limits prescribed by the statute authorizing it, the fine does not violate the Eighth Amendment.  Here, the fine assessed against Newell is only about 10% of the maximum fine for which Newell was eligible under the TSCA.  Newell's fine, therefore, does not violate the Eighth Amendment.  See Pharaon v. Board of Governors of Federal Reserve System, 135 F.3d 148, 155-57 (D.C. Cir. 1998) (finding no Eighth Amendment violation because the penalty was within the limits established by the applicable statute).

B.   Due Process Concerns

Newell's due process argument also fails.  Newell argues that an evidentiary hearing was "required" in this matter, and that the absence of one violated Newell's right to due process of law.  Petitioner's Brief at 55.  EPA regulations require that a hearing be held at a respondent's request if the party requesting the hearing has raised a genuine issue of material fact.  40 C.F.R. § 22.15; see also In re Green Thumb Nursery, Inc., FIFRA Appeal No. 95-42, 6 E.A.D. 782, 1997 WL 131973, at *8 (EAB Mar. 6, 1997) (Final Order).  Similarly, constitutional due process doctrine

15

requires that the person claiming the benefit of due process protections place some relevant matter into dispute. See Codd v. Velger, 429 U.S. 624, 627 (1977) ("[I]f the hearing mandated by the Due Process Clause is to serve any useful purpose, there must be some factual dispute. . . ."); Costle v. Pacific Legal Foundation, 445 U.S. 198, 213 (1980) (permitting the EPA to condition an adjudicatory hearing on "identification of a disputed issue of fact by an interested party"). The Presiding Officer's accelerated decision held that Newell raised no genuine issue of material fact that would necessitate an evidentiary hearing. The EAB agreed. We find no contested issue of fact on penalty in the record. We decline to set aside the penalty on due process grounds.

CONCLUSION

Because the applicable five-year statute of limitations does not bar the EPA's TSCA complaint, because Newell was liable for an "improper disposal" under the TSCA, and because the Presiding Officer's application of the EPA's 1990 Polychlorinated Biphenyls Penalty Policy generated a penalty that was not arbitrary, capricious, an abuse of discretion, constitutionally infirm or otherwise illicit, we affirm.

AFFIRMED.