656 F.2d 768
 16 ERC 1417, 211 U.S.App.D.C. 179, 11
Envtl. L. Rep. 20,487
 NATURAL RESOURCES DEFENSE COUNCIL, INC., Petitioner,
v.
U. S. ENVIRONMENTAL PROTECTION AGENCY and Douglas M. Costle,
Administrator, U. S. Environmental Protection
Agency, Respondents,
City of Skagway, Marina County Water District, City of
Wrangell, Alaska, Intervenors.
PACIFIC LEGAL FOUNDATION, a nonprofit California
Corporation, Petitioner,
v.
Douglas M. COSTLE, in his official capacity as Administrator
of the United States Environmental Protection
Agency, Respondent.
CITY OF SKAGWAY, a municipality, and Marina County Water
District, a public agency, Petitioners,
v.
Douglas M. COSTLE, in his official capacity as Administrator
of the United States Environmental Protection
Agency, and U. S. Environmental
Protection Agency, Respondents.
The MUNICIPALITY OF ANCHORAGE, ALASKA, Petitioner,
v.
Douglas M. COSTLE, in his official capacity as Administrator
of Environmental Protection Agency, and U. S.
Environmental Protection Agency, Respondents.
 Nos. 79-1639, 79-1934, 79-1935 and 79-2360.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 23, 1980.
Decided May 7, 1981.
 
 Stephen H. Schroeder, Washington, D. C., with whom Ronald J. Wilson, Washington, D. C., was on the brief for petitioner Natural Resources Defense Council, Inc. in No. 79-1639.
 Robert K. Best, Sacramento, Cal., with whom Robert A. Zumbrun, David M. Shell, Sacramento, Cal., Raymond M. Momboisse and Eileen B. White, Washington, D. C., were on the brief for petitioners in Nos. 79-1934 and 79-1935, and intervenors, Marina County Water District, et al. in No. 79-1639.
 Lee C. White, with whom Robert J. Saner, II, John McElroy Atkisson and Kenneth Norman, were on the brief for petitioner Municipality of Anchorage, Alaska in No. 79-2360.
 Nancy S. Bryson, Atty., Dept. of Justice and Bethami Auerbach, Atty., E. P. A. of the bar of the District of Columbia Court of Appeals pro hac vice by special leave of Court, Washington, D. C., with whom James W. Moorman, Asst. Atty. Gen., Angus MacBeth, Deputy Asst. Atty. Gen., Donald W. Stever, Jr., Atty., Dept. of Justice, Washington, D. C., were on the brief for respondents. John Hammock and Joan M. Cloonan, Attys., Dept. of Justice, Washington, D. C., also entered appearances for respondents.
 Before LUMBARD*, Senior Circuit Judge for the United States Court of Appeals for the Second Circuit, and ROBB and GINSBURG, Circuit Judges.
 Opinion for the Court filed by Circuit Judge ROBB.
 ROBB, Circuit Judge:
 
 
 1
 In this case the petitioners challenge regulations promulgated by the Administrator of the Environmental Protection Agency (EPA) to implement section 1311(h), 33 U.S.C. § 1311(h) (Supp. II 1978), of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq. (1976) (the Act). Section 1311(b)(1)(B) of the Act required municipal sewage plants to achieve a minimum sewage treatment standard by 1977, 33 U.S.C. § 1311(b)(1)(B) (1976); Montgomery Environmental Coalition v. Costle, 646 F.2d 568 at 574 (D.C.Cir., 1980). Section 1311(h), a 1977 amendment, allows municipalities to apply for a variance from the minimum standard of section 1311(b), 33 U.S.C. § 1311(h) (Supp. II 1978). The challenged regulations provide the standards for section 1311(h) variances.
 
 
 2
 On June 22, 1979 the Natural Resources Defense Council (NRDC) filed in this court a petition for review of the regulations. Later in June the Pacific Legal Foundation, the City of Skagway, Alaska, and the Marina County, California Water District (collectively referred to as PLF) filed petitions for review in the Ninth Circuit. The City of Wrangell, Alaska moved to intervene in the PLF action on August 24, 1979. On September 12, 1979, by motion of PLF, this court entered an order staying the final application deadline pending review of regulations. Anchorage, Alaska filed a petition for review of the regulations in the Ninth Circuit on September 19, 1979. Subsequently, the Ninth Circuit transferred the PLF, Wrangell and Anchorage petitions to this court and we consolidated the petitions on January 2, 1980.
 
 
 3
 NRDC argues that the Administrator has misinterpreted the law to provide too great an opportunity for variance applications. PLF and Anchorage argue that the regulations are too restrictive and impracticable. We conclude that but for two exceptions, the regulations faithfully implement the mandate of the statute.
 
 BACKGROUND
 
 4
 The discharge of sewage into a body of water may create severe environmental damage. The decomposition of organic matter consumes oxygen, and excessive oxygen demands may deprive fish, shellfish and aquatic wildlife of dissolved oxygen necessary to life. Solid matter from sewage may settle in layers on the floor of the water body and suffocate life forms that cannot escape. Acids and heavy metals may poison the water. In short, unrestricted discharges of sewage can cause environmental damage which in turn will affect the nation's health and welfare. The legacy of unrestricted sewage discharge is disease, reduced fishery and recreation resources, poisoned water supplies and ugly water bodies. See Council on Environmental Quality, Environmental Quality: First Annual Report, 29-42 (1970).
 
 
 5
 In 1972 Congress reacted to the continuing decline of our nation's waters by passing the Federal Water Pollution Control Act Amendments of 1972, Pub.L.No.92-500, 86 Stat. 816 (1972). The objective of the 1972 Act is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (1976). An interim goal of fishable, swimmable waters was set for July 1, 1983. 33 U.S.C. § 1251(a)(2) (1976). The ultimate goal of eliminating the discharge of pollutants into the nation's navigable waters was set for 1985. 33 U.S.C. § 1251(a)(1) (1976).
 
 
 6
 In order to achieve these goals restrictions were imposed on individual polluters by means of a permit system administered by EPA.[1] The statute made it unlawful to discharge a pollutant without a permit. 33 U.S.C. § 1311(a) (1976). The Administrator of the EPA (Administrator) issues a permit only if the applicant meets the criteria set out in the Act. 33 U.S.C. § 1342(a)(1) (1976).
 
 
 7
 One of the requirements of the 1972 Act was that publicly owned treatment works[2] in existence on July 1, 1977 at least meet effluent standards based on secondary treatment of sewage.[3] 33 U.S.C. § 1311(b)(1)(B) (1976). Although some treatment works met the deadline, thousands failed to achieve secondary treatment by July 1, 1977. See 3 A Legislative History of the Clean Water Act of 1977, 95th Cong., 2d Sess., Ser.No. 95-14, 450-51 (Remarks of Sen. Muskie) (1978) (hereinafter cited as Leg.Hist.); Note, The Clean Water Act of 1977 Modifications of the Municipal Program, 2 Harv.Envt'l L.Rev. 127, 129 (1977). The principal reason for this failure was the unavailability of federal construction funds due to a Presidential impoundment. See Note, Highlights of the Clean Water Act of 1977, 8 Envt'l Law. 869, 873 (1978).
 
 
 8
 The uniform requirement of secondary treatment of sewage by publicly owned treatment works was criticized by some cities as being unnecessary to full protection of the environment. For example, a representative of the city of Seattle testified before a Senate Subcommittee that the uniform secondary treatment requirement is an unnecessary burden on taxpayers because the treatment is not necessary to assure compliance with water quality standards in Puget Sound, Hearing Before the Subcommittee on Environmental Pollution of the Committee on Environment and Public Works of the United States Senate, 95th Cong., 1st Sess., Ser.No. 95-H25, Pt. 3, 60-63 (1977) (hereinafter cited as Senate Subcommittee Hearings ). The city of Port Angeles, Washington argued that the characteristics of the water body into which the city discharged reduced the value of secondary treatment of sewage for its discharge. Senate Subcommittee Hearings at 352-55. Anchorage, Alaska informed the Subcommittee that Cook Inlet, into which its three sewage plants discharge, has tidal ranges in excess of 30 feet. The Inlet is fed by over 620 million gallons of water per day from freshwater streams. The rapid dilution of the discharge under such conditions renders secondary treatment unnecessary, according to Anchorage. Senate Subcommittee Hearings, Part 8, at 269-71.
 
 
 9
 In 1977 Congress responded to such assertions by amending the Federal Water Pollution Control Act to provide for a variance from the secondary treatment requirement for treatment plants that can meet certain conditions. See 3 Leg.Hist. at 320-23. Congress expressed a desire to avoid "treatment for treatment's sake". Id. at 320. The full text of that provision is:
 
 
 10
 The Administrator, with the concurrence of the State, may issue a permit under section 1342 of this title which modifies the requirements of subsection (b)(1) (B) of this section with respect to the discharge of any pollutant in an existing discharge from a publicly owned treatment works into marine waters, if the applicant demonstrates to the satisfaction of the Administrator that
 
 
 11
 (1) there is an applicable water quality standard specific to the pollutant for which the modification is requested, which has been identified under section 1314(a)(6) of this title;
 
 
 12
 (2) such modified requirements will not interfere with the attainment or maintenance of that water quality which assures protection of public water supplies and the protection and propagation of a balanced, indigenous population of shellfish, fish and wildlife, and allows recreational activities, in and on the water;
 
 
 13
 (3) the applicant has established a system for monitoring the impact of such discharge on a representative sample of acquatic biota, to the extent practicable;
 
 
 14
 (4) such modified requirements will not result in any additional requirements on any other point or nonpoint source;
 
 
 15
 (5) all applicable pretreatment requirements for sources introducing waste into such treatment works will be enforced;
 
 
 16
 (6) to the extent practicable, the applicant has established a schedule of activities designed to eliminate the entrance of toxic pollutants from nonindustrial sources into such treatment works;
 
 
 17
 (7) there will be no new or substantially increased discharges from the point source of the pollutant to which the modification applies above that volume of discharge specified in the permit;
 
 
 18
 (8) any funds available to the owner of such treatment works under subchapter II of this chapter will be used to achieve the degree of effluent reduction required by section 1281(b) and (g)(2)(A) of this title or to carry out the requirements of this subsection.
 
 
 19
 For the purposes of this subsection the phrase "the discharge of any pollutant into marine waters" refers to a discharge into deep waters of the territorial sea or the waters of the contiguous zone, or into saline estuarine waters where there is strong tidal movement and other hydrological and geological characteristics which the Administrator determines necessary to allow compliance with paragraph (2) of this subsection, and section 1251(a)(2) of this title.
 
 
 20
 33 U.S.C. § 1311(h) (Supp. II 1978). This section was added to the Act as part of the Clean Water Act of 1977, Pub.L.No.95-217, § 44, 91 Stat. 1566 (1977). This opinion refers to this section as section 1311(h) and the Clean Water Act of 1977 as the 1977 Amendments.
 
 
 21
 A comparison of 33 U.S.C. § 1311(b)(1)(B) (a 1972 provision) with section 1311(h) (a 1977 provision) of the same title reveals a change in focus in the regulatory scheme. Subsection (b) of section 1311, the earlier provision, deals with minimal levels of technology which must be achieved by treatment plants by certain dates. Subsection (h) of the 1977 Amendments concentrates on the impact of the discharge on the water quality of the receiving water body. The difference is important and is the root of much of the controversy in this case.
 
 
 22
 The 1972 Amendments to the Federal Water Pollution Control Act drastically altered the federal approach to water pollution. The emphasis on maximum tolerable pollution in the waters was abolished, and in its place was substituted a permit system imposing direct restrictions on each source of pollution. See EPA v. State Water Resources Control Board, 426 U.S. 200, 202-05, 96 S.Ct. 2022, 2023-2025, 48 L.Ed.2d 578 (1976). The 1977 addition of section 1311(h) reflects a return, at least in part, to regulation of pollution by means of scrutiny of the impact of the polluter's discharge on the receiving waters. This is most clearly reflected in the language of section 1311(h)(2).
 
 
 23
 Congress recognized this change in regulatory approach and provided a 270-day period for applications under the new law. 33 U.S.C. § 1311(j)(1)(A) (Supp. II 1978). The effective date of the Clean Water Act Amendments of 1977 is December 27, 1977; however the Agency did not propose regulations under section 1311(h) until April 25, 1978. 43 Fed.Reg. 17484 (1978). The proposed regulations were the subject of many comments.
 
 
 24
 The Agency failed to promulgate final regulations in time to allow applicants to file final applications within the 270-day period fixed by the Act. On September 5, 1978 the Agency announced that it would accept preliminary applications until the statutory deadline, September 24, 1978. Final applications would be accepted after the final regulations issued. 43 Fed.Reg. 39398-99 (1978). The final regulations were issued on June 15, 1979. 44 Fed.Reg. 34784 (1979). The final deadline for application was set 90 days later. On September 12, 1979 this court stayed the final application deadline, pending review.
 
 STANDARD OF REVIEW
 
 25
 The role of this court in reviewing the propriety of regulations issued under the Clean Water Act is narrow. The regulations may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ..." 5 U.S.C. § 706(2)(A) (1976). The agency charged with administering the Act is entitled to deference in its construction of the Act's terms and requirements. EPA v. Nat'l Crushed Stone Ass'n, 449 U.S. 64, 83-85, 101 S.Ct. 295, 307, 66 L.Ed.2d 268 (1980).
 
 
 26
 However, this court will not act as a rubber stamp. The Agency must follow the established rules of statutory construction. Weyerhauser Co. v. Costle, 191 U.S.App.D.C. 309, 325, 590 F.2d 1011, 1027 (1978). Our duty is to see that the congressional mandate is carried out, and misinterpretation of that mandate will be corrected. Ass'n of American Railroads v. Costle, 183 U.S.App.D.C. 362, 370-71, 562 F.2d 1310, 1318-19 (1977).
 
 
 27
 The issues presented by this case are to a great extent issues of statutory construction. Where the Administrator's interpretation of the Act coincides with the purpose and intent of the statute we defer to his construction. Where the issue presented involves questions of scientific expertise or a choice between reasonable interpretations of the statute we defer to the Administrator's interpretation; however no amount of deference can justify an interpretation of the statute that is contrary to law.
 
 THE REGULATIONS
 
 28
 The regulations at issue are found at 40 C.F.R. §§ 125.56 .67 (1980). The regulations establish "the criteria and standards to be applied by EPA in acting on section 301(h) (1311(h)) requests for modifications to the secondary treatment requirements." Section 125.56. The regulations define various terms of importance to applicants seeking to discharge without secondary treatment. Section 125.58. Section 125.59 establishes the general application requirements and contains prohibitions on the issuance of permits for certain types of discharges. This section is attacked, as being too permissive on the one hand and too restrictive on the other. Section 125.61 lists the standards for maintenance of water quality near the proposed discharge. It also explains the permit application requirements for a discharge meeting such standards. Section 125.62 sets out the standards for monitoring the impact of the discharge on the receiving waters and requires that each applicant show how its monitoring program will operate. Section 125.64 requires that the applicant for a discharge permit show the sources and means of practical control of toxic matter in its discharge. This regulation is criticized as being both woefully inadequate and impracticable.
 
 
 29
 The regulations will be more fully discussed as each issue is dealt with in the balance of this opinion.
 
 JURISDICTION TO REVIEW THE REGULATIONS
 The Act provides that
 
 30
 Review of the Administrator's action ... in approving or promulgating any effluent limitation or other limitation under section 1311 ... may be had by any interested person in the Circuit Court of Appeals of the United States ... upon application by such person....
 
 
 31
 33 U.S.C. § 1369(b) (1976). PLF argues that this court does not have jurisdiction to review the challenged regulations because the regulations are not "effluent limitation(s) or other limitation(s) under section 1311", within the meaning of this section.
 
 The Act defines "effluent limitations" as
 
 32
 any restriction established ... on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources ....
 
 
 33
 33 U.S.C. § 1362(11) (1976). PLF argues that the regulations implementing section 1311(h) do not restrict sewage discharges, but are intended to allow more discharge of sewage into the waters; therefore, says PLF, the regulations are not effluent limitations, and this court does not have jurisdiction to review them.
 
 
 34
 The regulations which implement section 1311(h) are "effluent limitations ... under section 1311", as required by section 1369(b). It is true that the regulations allow municipalities to apply for a variance from the normal requirement of secondary sewage treatment; however the regulations do not allow all municipalities to apply for the section 1311(h) permit. As a practical matter they restrict the discharge of sewage by limiting the availability of a variance to a class of applicants which does not include all coastal municipalities. PLF itself argues that the regulations by tending to restrict the availability of a section 1311(h) permit require more treatment of sewage. We think the regulations are "effluent limitations ... under section 1311."
 
 
 35
 We note also that section 1311(h) provides that a permit granted pursuant to that section shall be issued "under section 1342". A permit issued under section 1342 is reviewable in a court of appeals under section 1369(b)(1)(F).[4] If we hold that the regulations here are not reviewable in a court of appeals the "perverse situation" to which the Supreme Court referred in E.I. duPont de Nemours & Co. v. Train, 430 U.S. 112, 136, 97 S.Ct. 965, 979, 51 L.Ed.2d 204 (1977), will be created: we will be able to review the grant or denial of the permit, but will be without authority to review directly the regulations on which the permit is based.
 
 
 36
 PLF relies on American Iron & Steel Institute v. EPA, 543 F.2d 521 (3d Cir. 1976) to support its argument that this court is without jurisdiction. In that case the court dismissed petitions for review of regulations which did "no more than prescribe the policy and procedures to be followed in connection with applications for permits." 543 F.2d at 526. The court concluded that the regulations were not "effluent limitations" under section 1369(b)(1)(E) because they did not "prescribe specific number limitations for any pollutant (or) ... list the factors which must be considered in determining the control measures which individual point sources must employ"; further, the regulations did not alter the basic effluent limitation which they amended. 543 F.2d at 527.
 
 
 37
 We are not persuaded by the analysis in American Iron. Moreover, that case is distinguishable from the one before us on several grounds. First, the case was decided prior to Crown Simpson Pulp Co. v. Costle, 445 U.S. 193, 100 S.Ct. 1093, 63 L.Ed.2d 312 (1980), in which the Supreme Court, while reserving judgment on review under section 1369(b)(1)(E), reversed a ruling based on a narrow interpretation of section 1369(b)(1). In reversing the circuit court of appeals, the Court emphasized the practical impact of the decision rather than a literal reading of the statute.
 
 
 38
 Second, the regulations challenged here would in practice limit the discharge of sewage by limiting the availability of a section 1311(h) permit. Third, while the regulations do not contain specific number limitations in all cases, their purpose is to prescribe in technical terms what the Agency will require of section 1311(h) permit applicants. These facts are sufficient to distinguish the regulations in this case from the regulations challenged in the American Iron case.
 
 
 39
 We conclude that the challenged regulations amount to "effluent limitations" within the meaning of section 1369(b)(1)(E). This court has jurisdiction to review them.
 
 
 40
 ELIGIBILITY TO APPLY FOR A SECTION 1311(h) VARIANCE
 
 
 41
 In promulgating section 125.59 of the regulations the Administrator included a list of nine "prohibitions" on issuance of a permit under section 1311(h), 40 C.F.R. § 125.59(b)(1)-(9) (1980). The effect of the prohibitions is to render certain treatment plants ineligible for section 1311(h) variances. Similarly, the failure of the Administrator to include certain prohibitions opens the application process to cities that, according to NRDC, are not legally eligible to apply under the Act. We discuss each of the eligibility issues separately.
 
 West Coast Limitation
 
 42
 NRDC argues that section 1311(h) applies only to dischargers located on the west coast and island jurisdictions such as Hawaii, Puerto Rico, and the Virgin Islands. According to NRDC, cities located on the east coast are not eligible to apply for a variance and the Administrator has erred in not restricting permit eligibility to the west coast and island jurisdictions. (Br. for NRDC at 47-52, Rep. Br. for NRDC at 27-28).
 
 
 43
 There is nothing in the language of section 1311(h) that limits the availability of a variance to west coast cities and certain islands. The declaration of goals and policies in 33 U.S.C. § 1251 expressly sets nationwide goals. The restrictions on dischargers in section 1311(b) are national in scope. Nevertheless, NRDC argues that in amending the Act in 1977 Congress intended to create a regional variance or exemption without expressly stating such an intent.
 
 
 44
 We are loath to imply a special application to a particular region of the country when Congress, composed of senators and representatives from every state in the Union, chose language of general application. It is enough to say that the statutory language is not ambiguous. In any case, an act which amends a statute of general application is also an act of general application. See Unity v. Burrage, 103 U.S. 447, 456, 26 L.Ed. 405 (1880). We therefore reject NRDC's restrictive construction of the statute in this respect.
 
 Discharge of Substantial Amounts of Toxics
 
 45
 NRDC also argues that treatment plants whose discharges contain a "substantial" amount of toxics are not eligible to apply for section 1311(h) permits. NRDC does not base this argument on the language of section 1311(h), but insists that a toxics eligibility standard must be implied from the legislative history. (Br. for NRDC at 43-47, NRDC Rep.Br. at 29-33). We reject this argument.
 
 
 46
 Both the Administrator and NRDC agree that the discharge of "substantial" amounts of toxics[5] into the ocean is not permitted under section 1311(h). (Br. for NRDC at 43-45, Br. for EPA at 64, Rep.Br. for NRDC at 29). However, the Administrator contends that his regulation, section 125.64 imposes all the toxic controls required by section 1311(h).
 
 
 47
 The regulations specify the toxic controls which must be shown in an application for a section 1311(h) permit. An applicant must submit a chemical analysis of its discharge in order to identify toxics, section 125.64(a). The applicant must identify, to the extent practicable, the sources of the toxic pollutants in its discharge, section 125.64(b). Section 125.64(c) requires pretreatment programs to control the entry of toxics from industrial sources into the applicant's treatment system. Similar programs for the control of toxics from non-industrial sources are required under section 125.64(d). The applicant must also show that its discharge will meet the water quality standards of section 1311(h)(2). Under section 1311(h)(2) the discharge must not interfere with the maintenance of a balanced indigenous population of fish, shellfish, and wildlife among other conditions.
 
 
 48
 These regulations are intended to implement fully the toxic control requirements of section 1311(h), and we think they do, but NRDC argues that there is a further requirement. Under its interpretation, only treatment plants that can show the absence of a "substantial" amount of toxics in the discharge may even apply for a permit.
 
 
 49
 No such eligibility restriction appears in section 1311(h). NRDC cites legislative history illustrating congressional concern over the problems created by toxic discharges, e. g., 3 Leg.Hist. 447-48 (Remarks of Sen. Muskie). We have no doubt that toxic pollutants are a subject of grave concern to the Congress. The fact remains however that although congressional concern over toxics led to some additional restrictions in section 1311(h), see e. g., 4 Leg.Hist. 1033-34 (Remarks of Sen. Gravel), the concern did not result in the prohibition sought by NRDC. We will not imply such a restriction under these circumstances.
 
 Minimum Depth Requirement
 
 50
 NRDC argues that the Administrator has misinterpreted section 1311(h) by failing to promulgate a minimum depth standard on applications for permits under that section. We repeat the pertinent statutory language:
 
 
 51
 The Administrator ... may issue a permit ... with respect to the discharge of any pollutant in an existing discharge from a publicly owned treatment works into marine waters ... (when certain facts are shown).
 
 
 52
 For the purposes of this subsection the phrase "the discharge of any pollutant into marine waters" refers to a discharge into deep waters of the territorial sea or the waters of the contiguous zone, or into saline estuarine waters where there is strong tidal movement and other hydrological and geological characteristics which the Administrator determines necessary to allow compliance with paragraph (2) of this subsection, and section 1251(a)(2) of this title.
 
 
 53
 33 U.S.C. § 1311(h) (Supp. II 1978).
 
 
 54
 As the source of its argument NRDC points to the phrase "deep waters of the territorial sea or the waters of the contiguous zone" in the last sentence of the section.
 
 
 55
 "Territorial sea" is defined in the Act as
 
 
 56
 the belt of the seas measured from the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters, and extending seaward a distance of three miles.
 
 
 57
 33 U.S.C. § 1362(8) (1976).
 
 
 58
 The contiguous zone referred to in the statute extends another twelve miles into the ocean.[6] Thus, it appears that the "deep waters" language refers to a fifteen mile wide belt of ocean. NRDC argues that the word "deep" adds an eligibility restriction which the Administrator has ignored.
 
 
 59
 Depth was a subject of concern to Congress in its consideration of section 1311(h). The statute itself uses the word "deep." The Conference Committee Report states that "(d)epth is a key factor in determining the amount of circulation in waters of the territorial sea or contiguous zone." 3 Leg.Hist. at 259. NRDC cites several appearances of the expression "deep marine discharge", e. g., 3 Leg.Hist. 257, or "deep marine outfalls", e. g., 3 Leg.Hist. 320. NRDC also cites a letter from the Assistant Administrator for Water and Hazardous Materials stating that the Agency interprets section 1311(h) to apply to "... outfalls into very deep waters ...", 3 Leg.Hist. 449.
 
 
 60
 A citation to legislative history which mentions the word "deep" is not helpful in defining the content of the statutory term. It amounts to mere repetition. "Very deep" is no more helpful. The question remains, what is "deep"?
 
 
 61
 During the rulemaking proceeding the Administrator stated that the Agency is "unable to establish a scientifically defensible minimal depth limitation for inclusion in the final regulations." 44 Fed.Reg. 34802 (1979). The only depth figure mentioned in the legislative history is a statement in the Conference Committee Report that 200 feet is sometimes an inadequate depth to assure proper dispersion of the discharge. 3 Leg.Hist. 259. The Administrator concluded that a minimum depth standard of 200 feet "would automatically preclude all but approximately half a dozen ocean dischargers from even being considered for a modification". 44 Fed.Reg. 34802 (1979).
 
 
 62
 The Administrator did not ignore the statutory language. Under the final regulations the depth factor will be taken into account as part of the water quality standards of section 126.61. For example, if the outfall is so shallow as to interfere with swimming, diving and boating it will not meet the requirements of section 125.61(d)(1)(i). If a discharge is located so that it interferes with migratory patterns it may run afoul of section 125.61(c)(1) (iii)(B). Sewer outfalls that are placed at a depth where there is insufficient circulation to assure dilution will not meet the requirements of section 125.61(a)(1)(iv). None of these regulations mentions depth as a specific requirement. Yet each of the regulations may function as a check on inadequate placement of outfalls, including inadequate depth. Under the scheme of the final regulations depth is a factor, but not a controlling factor.
 
 
 63
 We are convinced that the word "deep" in section 1311(h) does not refer to any uniform minimum depth in feet. Depth is not an independent controlling factor because it is but one factor which must be taken into account. The Agency must consider depth, but it must also consider offshore distance, geological characteristics, and tidal movements. 3 Leg.Hist. 259. The interpretation urged on the court by NRDC elevates depth to the status of a controlling factor. The Administrator's interpretation treats depth as one factor in the environmental calculus set up in section 1311(h). We hold that this is a reasonable and proper interpretation.
 
 Existing, Current, and Improved Discharges
 
 64
 Section 1311(h) states thatThe Administrator ... may issue a permit ... with respect to the discharge of any pollutant in an existing discharge from a publicly owned treatment works into marine waters ....
 
 
 65
 33 U.S.C. § 1311(h) (Supp. II 1978) (emphasis added).
 
 
 66
 In publishing proposed rules under this section in April 1978 the Administrator interpreted "existing discharge" to mean "a discharge which was actually flowing into marine waters ... on or prior to December 27, 1977" (the date of enactment). 43 Fed.Reg. 17494 (1978) (proposed rule 233.11(b) (2)). The proposed rules barred applications from treatment plants whose discharge had been altered since December 27, 1977. The analysis which accompanied the proposed rules invited comments on this threshold disqualification. In particular, the Administrator requested comments on upgraded treatment methods, relocated sewage outfalls, and planned construction. If altered discharges were to be eligible, the Administrator requested comments on the possible difficulties in predicting the impact of the altered discharge on the environment. 43 Fed.Reg. 17487-88 (1978).
 
 
 67
 The proposed definition of "existing discharge" was the subject of numerous comments. Some commenters urged the Administrator to consider discharges only as of December 27, 1977. Others sought a less restrictive definition. 44 Fed.Reg. 34788 (1979).
 
 
 68
 In response to the comments the Administrator altered the regulations to allow permit applications based on either the "current discharge" or an "improved discharge."[7] A discharge that "was not actually flowing into (marine waters) as of December 27, 1977" may not form the basis for a permit. 40 C.F.R. § 125.59(b)(3) (1980).
 
 
 69
 NRDC contends that section 1311(h) cannot be interpreted to allow permits based on improved discharges. According to NRDC the legislative history conclusively establishes that the permits must be based only on discharges as they existed on December 27, 1977. (Br. for NRDC at 28-31) To support this contention NRDC cites several instances of the use of the term "existing deep marine discharge" or "existing deep marine outfalls" in the legislative history, e. g., 3 Leg.Hist. 257, 320. As is the case with the depth argument, p. 778, supra, mere repetition of the statutory language sheds little light on its meaning.
 
 
 70
 It is clear that Congress did not wish to authorize section 1311(h) permits for non-existing discharges. This purpose is implemented in the final regulations by the requirement that the discharge must have been actually flowing into marine waters on December 27, 1977. See 40 C.F.R. § 125.59(b)(3) (1980). But what of changes that have occurred or are planned in discharges that existed on December 27, 1977?
 
 
 71
 Congress was silent on this subject. The proper approach under such circumstances is to interpret the statute in light of its purpose. See Sea-Land Service, Inc. v. Kreps, 185 U.S.App.D.C. 98, 108, 566 F.2d 763, 773 (1977). The purpose of section 1311(h) is to allow treatment plants that can discharge into marine waters and meet certain environmental standards to demonstrate those facts to the Agency and receive a permit. See, e. g., 3 Leg.Hist. 257-59. Although fiscal concerns are not paramount under section 1311(h), Congress has determined to allow some savings in sewage treatment through harmless marine discharges. The overriding purpose of the Act is still the prevention of water pollution.[8]
 
 
 72
 This statutory purpose is served by allowing treatment plants that have planned improvements to apply for permits under section 1311(h). Treatment plants that made no effort to upgrade operations are eligible because their discharge still is as it existed in December 1977. By allowing treatment plants to apply for permits based on improved discharges the Agency has encouraged upgraded operations and treatment savings while preserving the opportunity for such plants to apply for permits. This is consistent with the purpose of section 1311(h).
 
 
 73
 NRDC also argues that granting section 1311(h) permits for improved discharges necessarily requires unauthorized extensions of the July 1, 1977 deadline for achievement of secondary treatment, 33 U.S.C. § 1311(b)(1)(B) (1976). (NRDC Br. at 32-36, NRDC Rep. Br. at 24-25) According to NRDC such extensions are unavoidable because applicants for "improved discharge" permits will need time beyond July 1, 1977 to complete improvements. NRDC contends that the Administrator has no authority to grant extensions to section 1311(h) applicants.
 
 
 74
 NRDC's argument is seriously flawed in two respects. First, it proves too much in that not only would improved discharges be ineligible for permits under section 1311(h), but any applicant who was not in complete compliance with the secondary treatment requirement would be ineligible. If the Secretary has no authority to grant extensions to applicants who have not complied with the secondary treatment requirement, then only those applicants who have reached secondary treatment may apply to discharge sewage treated at a stage below secondary levels. There is no indication that Congress intended to restrict the availability of section 1311(h) to those municipalities which had expended tax dollars to build a plant capable of secondary treatment. Secondary treatment is to be avoided under section 1311(h), and it would make no sense to require a municipality to build a plant in order to apply for permission not to use it.
 
 
 75
 The second serious flaw in NRDC's argument is that it ignores the period of non-compliance assumed in the statute itself. Congress knew that thousands of municipalities had not met the July 1, 1977 deadline. See pp. 772-773, supra. Congress authorized coastal municipalities to apply for section 1311(h) permits, and did not restrict the eligibility of municipalities not in compliance with the July 1, 1977 deadline. Congress itself recognized that noncomplying municipalities would apply for section 1311(h) permits. See, e. g., 3 Leg.Hist. 449-51, 535. Therefore a period of non-compliance was assumed for at least some section 1311(h) applicants. Under NRDC's interpretation no period of non-compliance can be allowed, yet Congress itself assumed such a period.
 
 
 76
 To the extent that municipal applicants are not in compliance with the July 1, 1977 deadline it is the responsibility of the municipalities, not the Administrator. The Administrator's regulations do not encourage non-compliance. Non-complying municipalities may apply for a variance, but the ultimate responsibility for statutory compliance rests on the municipal applicant. See 44 Fed.Reg. 34793 (1979). The statutory deadline is not extended unless an application is granted, a result clearly intended by Congress.
 
 
 77
 The Administrator's interpretation of the statute does not result in an impermissible extension of the July 1, 1977 deadline. The regulation which allows applications based on improved discharges does not involve any extension of the deadline which is not implicit in the statute. We conclude that all of the objections to the Administrator's interpretation of "existing discharge" are unavailing.
 
 Untreated Sewage and Sludge
 
 78
 The final regulations prohibit the issuance of a permit under section 1311(h) for the discharge of sewage receiving less than primary treatment or for the discharge of sludge. 40 C.F.R. § 125.59(b)(4) & (5) (1980).
 
 
 79
 The Pacific Legal Foundation argues that these prohibitions embody a misinterpretation of the statute. Primary treatment is "the first stage in wastewater treatment where substantially all floating or settleable solids are removed by flotation and/or sedimentation." 40 C.F.R. § 125.58(m) (1980). Sludge is solid material that is removed from sewage during treatment. Costle v. Pacific Legal Foundation, 445 U.S. 198, 201, 100 S.Ct. 1095, 1098, 63 L.Ed.2d 320 (1980).
 
 Section 1311(h) states that:
 
 80
 The Administrator ... may issue a permit ... with respect to the discharge of any pollutant in an existing discharge ....
 
 
 81
 33 U.S.C. § 1311(h) (Supp. II 1978) (emphasis added). The Act defines "pollutant" to include both "sewage" and "sewage sludge", 33 U.S.C. § 1362(6) (1976). The definition of "pollutant" in section 1362(6) was part of the 1972 Act. See Pub.L.No.92-500, § 502, 86 Stat. 816 (1972). Section 1311(h), added in 1977, contains no special definition of "pollutant". Because an amended act should be read as a whole, see United States v. La Franca, 282 U.S. 568, 575-76, 51 S.Ct. 278, 281-282, 75 L.Ed. 551 (1931), the definition of pollutant in section 1362(6) applies to the use of the same term in section 1311(h). It is as if the amendment was part of the original act. See Blair v. Chicago, 201 U.S. 400, 475, 26 S.Ct. 427, 446, 50 L.Ed. 801 (1906). On its face, therefore, section 1311(h) authorizes the issuance of a permit to discharge sewage or sludge if the applicant can meet the other conditions of the section.
 
 
 82
 The Administrator attempts to avoid the plain meaning of the statute by means of legislative history and policy arguments. Upon close inspection, however, the legislative history does not support the Administrator's position. The practical result of a literal interpretation of the statute is not absurd or futile. For this reason the policy arguments are insufficient to contradict the language chosen by Congress.
 
 
 83
 The Administrator relies on a statement by the Senate sponsor of the bill which became section 1311(h) to the effect that the bill would create a narrow exception to the uniform secondary treatment requirement of the Act. 3 Leg.Hist. at 428. The Administrator also states that nothing in the legislative history of the 1977 amendments affirmatively supports the discharge of untreated sewage or sludge. (EPA Br. at 49) Neither of these arguments can change the language of the statute and this court cannot ignore that language. Legislative silence is not a reliable indicator of congressional intent. See NLRB v. Plasterer's Union, 404 U.S. 116, 129-30, 92 S.Ct. 360, 368-369, 30 L.Ed.2d 312 (1971).
 
 
 84
 The Administrator also points to section 1412a of the Marine Protection, Research, and Sanctuaries Act, 33 U.S.C. § 1401 et seq. (1976 & Supp. II 1978), to justify his interpretation of section 1311(h) of the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977.[9] Section 1412a provides that:
 
 
 85
 (a) The Administrator of the Environmental Protection Agency (hereinafter referred to in this section as the "Administrator") shall end the dumping of sewage sludge into ocean waters, or into waters described in section 1411(b) of this title, as soon as possible after November 4, 1977, but in no case may the Administrator issue any permit, or any renewal thereof (under Title I of the Marine Protection, Research, and Sanctuaries Act of 1972) which authorizes any such dumping after December 31, 1981.
 
 
 86
 (b) For purposes of this section, the term "sewage sludge" means any solid, semisolid, or liquid waste generated by a municipal wastewater treatment plant the ocean dumping of which may unreasonably degrade or endanger human health, welfare, amenities, or the marine environment, ecological systems, or economic potentialities.
 
 
 87
 33 U.S.C. § 1412a (Supp. II 1978).
 
 
 88
 The Marine Protection Act sets up a permit system to regulate the dumping of pollutants into the ocean from vessels, 33 U.S.C. §§ 1411, 1412 (1976), but does not govern the discharge of pollutants from sewer outfalls. This is evident from the definition of "dumping" in 33 U.S.C. § 1402(f) (1976), which excludes "a disposition of any effluent from any outfall structure to the extent that such disposition is regulated under the provisions of the Federal Water Pollution Control Act ...." The Federal Water Pollution Control Act governs the discharge of pollutants into the ocean through outfalls no matter how far offshore the outfall terminates. 33 U.S.C. § 1362(12 & 14) (1976 & Supp. II 1978), § 1342(a)(1) (1976); Pacific Legal Foundation v. Costle, 586 F.2d 650, 665-56 (9th Cir. 1978), rev'd on other grounds, 445 U.S. 198, 100 S.Ct. 1095, 63 L.Ed.2d 329 (1980).
 
 
 89
 The Administrator states that section 1412a absolutely prohibits the ocean dumping of sludge after December 31, 1981. (Br. for EPA at 50) Therefore, he says, "it would be anomalous if Congress, in a limited variance provision enacted a month after it set a deadline for ending sludge dumping in ocean waters, authorized EPA to issue such variances to dischargers of sewage or sewage sludge from outfalls into waters closer to shore". (Br. for EPA at 51)
 
 
 90
 The apparent anomaly disappears upon a thorough study of section 1412a. The section does not create an absolute ban on ocean dumping of sludge, for the absolute terms of section 1412a(a) are qualified by the definition of sludge in subsection (b). Only dumping sludge which "may unreasonably degrade or endanger human health, welfare, amenities, or the marine environment, ecological systems, or economic potentialities" is prohibited. See New York v. EPA, No. 80 Civ. 1677, slip op. at 3 (S.D.N.Y. April 14, 1981).
 
 
 91
 This interpretation of section 1412a is fully supported by the legislative history of H.R. 4297, the bill which became Pub.L.No.95-153, 91 Stat. 1255 (1977) codified as section 1412a. The House Committee on Merchant Marine and Fisheries added the language of section 1412a to the bill after rejecting a version that would have absolutely prohibited the dumping of sludge, harmful or not, after December 31, 1981. See H.R.Rep.No.95-325 (Part I) 95th Cong., 1st Sess. 1-4 (1977), U.S.Code Cong. & Admin.News 1977, p. 3262. The House and Senate passed the bill without amending the relevant portion. 123 Cong.Rec. 33789-90 (1977), 123 Cong.Rec. 34588 (1977). During debate the bill was described to the House and Senate in terms that do not support an absolute interpretation of section 1412a. 123 Cong.Rec. 33170 (1977) (Remarks of Rep. Breaux); Id. at 33171 (Remarks of Rep. Ruppe); Id. at 33787-88 (Remarks of Rep. Hughes); Id. at 34585-86 (Remarks of Sen. Moynihan, Sen. Muskie and Sen. Mathias). As the House Committee Report states, "the substitute altered language so as not to prohibit the dumping of all sewage sludge after 1981, but only sewage sludge which may unreasonably degrade the marine environment". H.R.Rep.No.95-325 (Part I) 95th Cong., 1st Sess. 2 (1977), U.S.Code Cong. & Admin.News 1977, p. 3263. Thus the interpretation of section 1412a urged on this court by the Administrator was specifically rejected by the Congress.[10]
 
 
 92
 If the contemporaneous enactment of section 1412a of the Marine Protection Act has any influence on the proper interpretation of section 1311(h) the influence is contrary to that suggested by the Administrator. Under section 1412a the Administrator must determine which sludge dumping operations will unreasonably degrade the marine environment. The regulations that deal with ocean dumping contain no absolute prohibition on applications for permits to dump sludge. See 40 C.F.R. Part 220 (1980). Thus, even under the statute which the Administrator argues is "absolute" the regulations permit applications for sludge dumping.
 
 
 93
 The Administrator's attempt to avoid the plain meaning of section 1311(h) relies to a great extent on legislative history. Where the statutory language is plain and direct any contrary meaning must be shown by legislative history that is more plain and direct. See Aaron v. SEC, 446 U.S. 680, 697, 100 S.Ct. 1945, 1956, 64 L.Ed.2d 611 (1980); Markham v. Colonial Mortgage Service Co., 196 U.S.App.D.C. 50, 53-54, 605 F.2d 566, 569-70 (1979). The legislative history that the Administrator relies on simply does not rise to the level necessary to contradict the statute.[11]
 
 
 94
 For the above reasons it appears that the plain language of the statute must prevail. Section 1311(h) authorizes applications for permits to discharge "any pollutant", which includes sewage and sludge. The regulation to the contrary, 40 C.F.R. § 125.59(b)(4) & (5), is not in conformity with the statute.
 
 
 95
 Plants That Have Achieved Secondary Treatment
 
 
 96
 The final regulations also prohibit the issuance of a section 1311(h) permit "(w)here the applicant is currently meeting effluent limitations based on secondary treatment." 40 C.F.R. § 125.59(b)(9) (1980). The Administrator explained the need for this prohibition during the rulemaking proceeding as follows:
 
 
 97
 In response to the question whether dischargers which are currently achieving effluent limitations based on secondary treatment may apply for a section 301(h) (1311(h)) permit, this provision makes clear that such dischargers are ineligible for modified permits. Extensive discussion in the legislative history emphasizes that section 301(h) is a narrowly drafted provision which allows certain dischargers who meet the statutory criteria to obtain permits which modify the requirements of secondary treatment. There is no indication that Congress intended to enable dischargers who have attained effluent limitations based on secondary treatment to relax their efforts, in clear contradiction of the goals and policies stated in section 101 (1251) of the Act.
 
 
 98
 44 Fed.Reg. 34798 (1979).
 
 
 99
 The purpose of section 1311(h) is to permit some coastal municipal sewage treatment plants to avoid costs associated with secondary treatment so long as environmental standards can be maintained. If a treatment plant can discharge a pollutant and meet the criteria of section 1311(h) unnecessary expenditures may be avoided.
 
 
 100
 The Administrator avers in the above quoted passage that the goals of section 101 of the Act, 33 U.S.C. § 1251 (1976), are contradicted by allowing plants that have achieved secondary treatment to apply for permits under section 1311(h); but to the extent that this is true the decision has been made by Congress. The Administrator cannot restrict the scope of the statute by reasoning that undercuts the purpose of the statute.
 
 
 101
 The Administrator argues that the legislative history "does not suggest that in enacting (section 1311(h)) Congress meant to sanction a retreat or 'backsliding' where statutory goals had already been achieved." (Br. for EPA at 62) On the contrary, there is some indication that the Agency and the Congress knew that the terms of section 1311(h) would allow plants performing at the secondary treatment level to apply. The Assistant Administrator for Water and Hazardous Materials sent a letter to Senator Muskie which listed cities in California as potentially eligible under section 1311(h). That list includes at least one water district that had achieved secondary treatment Marina County Water District, California. 3 Leg.Hist. 449-50. (Br. for PLF at 23, Br. for EPA at 61, n.46) If secondary treatment achievement was a factor the Agency should have excluded the Marina County Water District. Further, Congress knew that many municipalities had achieved secondary treatment, see p. 771, supra, yet Congress showed no inclination to exclude them from the benefits of section 1311(h).
 
 
 102
 Senator Gravel submitted a statement during the Senate debate on the conference bill which included the following comments:
 
 
 103
 When I introduced the measure I did not intend to limit the application of the provision to Anchorage, Seward, and a few other cities. I intended to allow any city that can meet the geographical requirements to come forward and attempt to prove their case. (That might even include communities currently under schedule to provide traditional secondary treatment.) That is my understanding of the conference's intention as well.
 
 
 104
 3 Leg.Hist. at 535 (emphasis added).
 
 
 105
 We think the Administrator's decision is arbitrary and capricious in that it unreasonably prohibits applications from those cities that have achieved secondary treatment. Treatment plants that are under schedule to achieve secondary treatment are eligible to apply for a permit. See Senator Gravel's comment, supra. A treatment plant that has expended the funds to achieve secondary treatment but has failed to achieve consistent treatment levels is eligible to apply for a permit. (Br. for EPA at 61, n.46) Thus, the amount of money expended to achieve secondary treatment is irrelevant under the Administrator's scheme. A treatment plant that did not even attempt to achieve secondary treatment is eligible to apply because it has not achieved secondary treatment. However, a treatment plant that attempted to comply with the statutory mandate, 33 U.S.C. § 1311(b)(1)(B) (1976), and did so successfully, is not eligible. The Agency is rewarding failure and punishing achievement.
 
 
 106
 The regulatory scheme penalizes treatment plants that complied with the statutory deadline. A plant that met the deadline cannot apply for a permit, and reduce costs if the permit is granted, for no other reason than that it met the deadline. Nothing in the statute indicates that Congress intended such arbitrary and potentially wasteful distinctions to be made. The regulation prohibiting the issuance of permits for plants that have achieved secondary treatment cannot stand.
 
 
 107
 APPLICATION CONTENTS, TOXIC CONTROLS, & BIOLOGICAL MONITORING
 
 
 108
 The challenged regulations are criticized as being overly detailed and inflexible in setting out the requirements for a proper application under section 1311(h). We deal here with the significant objections to the application content regulations.
 
 
 109
 Anchorage contends that certain of the regulations concerning the content of applications for section 1311(h) permits impose unreasonable and impractical requirements. Specifically, Anchorage complains that section 125.64(d) imposes impractical requirements for the control of toxic pollutants from non-industrial sources (Br. for Anchorage at 23-27) and that section 125.62(b) imposes impractical requirements for monitoring the impact of a discharge on aquatic life. (Br. for Anchorage at 18-21) Anchorage points out that because of the unique characteristics of Cook Inlet there may be great difficulty in performing year-round tests, sampling aquatic life under ice, etc. We are urged to find that the requirement of data on the impact of a discharge on public water supplies, aquatic life, and recreational uses of the water body, section 125.61(b)(c) & (d), and the chemical assessment of the discharge, section 125.61(a) are unnecessary. (Br. for Anchorage at 14-18)
 
 
 110
 To a large extent Anchorage's complaints originate in the allegedly unique nature of the Anchorage environment. However, because the Agency must regulate more locations than Anchorage, the regulations need not be tailored to fit its individual characteristics.
 
 
 111
 The regulations are, however, worded in a manner that suggests a lack of flexibility. See, e. g., section 125.59(b)(8); section 125.62(b)(1)(iii). We have been assured by the Agency that the application requirements will be enforced with flexibility and discretion. (Br. for EPA at 80, n.60, 81, n.62) The attorneys for the Agency made similar representations to the court at oral argument. We expect this to be the case.
 
 
 112
 The argument that the toxic control program envisaged by section 125.64(d) is impractical cannot be completely dealt with by promises of flexibility. Anchorage contends that the toxic control program of section 125.64(d) exceeds that required of plants treating sewage at the secondary stage. (Br. for Anchorage at 21-22) The Administrator informs the court that the practicability requirement of the statute[12] is preserved in the regulations by placing the burden on the applicant to show what economic, legal, or institutional limitations render greater toxic control efforts impracticable. (Br. for EPA at 71-72, citing 44 Fed.Reg. 34812 (1979))
 
 
 113
 Section 125.64(d) is a reasonable interpretation of the statutory requirement. The applicant bears the burden of showing why more toxic control is not practicable. We note, however, that the issue of the practicability of a program required of a particular permittee is not before this court. We therefore cannot rule on the question of whether an applicant "must consider as an offset to the costs of source control any savings in capital or operating and maintenance expenses which may accrue as a result of being issued a (section 1311(h)) modified permit." 44 Fed.Reg. 34812 (1979). Whether this requirement is "practicable" in the statutory sense will depend on the particular circumstances of each municipal applicant.[13]
 
 CONCLUSION
 
 114
 For all of the foregoing reasons the regulations implementing the section 1311(h) variance for publicly owned treatment works are upheld and the petitions denied, with the exception that the restrictions on the eligibility of plants which have achieved secondary treatment and plants discharging sewage and sludge, 40 C.F.R. § 125.59(b)(4 & 5), (b)(9) (1980), are remanded to the Administrator for further proceedings consistent herewith. The stay of the final application deadline entered by this court on September 12, 1979 is lifted.
 
 
 115
 So Ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(d)
 
 
 [1]
 The applicant for a permit must obtain a permit from a state agency if such an agency has been set up and approved under the Federal Water Pollution Control Act, 33 U.S.C. §§ 1311(a), 1342(a) & (b) (1976 & Supp. II 1978). See EPA v. State Water Resources Control Board, 426 U.S. 200, 208, 96 S.Ct. 2022, 2026, 48 L.Ed.2d 578 (1976)
 
 
 [2]
 "Publicly owned treatment works" are defined in 33 U.S.C. § 1292(2) (1976 & Supp. II 1978). This definition is incorporated in the regulations at issue in this case, 40 C.F.R. § 125.58(p) (1980)
 
 
 [3]
 The regulations here at issue define "secondary treatment" in terms of biochemical oxygen demand, suspended solids, and pH. Secondary treatment achieves certain minimum levels of removal which result in less potential damage to the receiving waters. See 40 C.F.R. §§ 125.58(r), 133.102 (1980). Primary treatment is "the first stage of wastewater treatment where substantially all floating or settleable solids are removed by flotation and/or sedimentation". 40 C.F.R. § 125.58(m) (1980)
 
 
 [4]
 Review of the Administrator's action ... (F) in issuing or denying any permit under section 1342 ..., may be had by any interested person in the Circuit Court of Appeals of the United States
 33 U.S.C. § 1369(b)(1)(F) (1976).
 
 
 [5]
 Neither the Administrator nor NRDC can define the term "substantial". Some guidance as to the substance of the controversy may be gleaned by reference to 33 U.S.C. § 1251(a)(3) (1976) which states that "it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited". "Toxic pollutant" is defined in 33 U.S.C. § 1362(13) (1976) to mean "those pollutants, or combinations of pollutants, including disease- causing agents, which after discharge and upon exposure, ingestion, inhalation or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will, on the basis of information available to the Administrator, cause death, disease, behavioral abnormalities, cancer, genetic mutations, physiological malfunctions (including malfunctions in reproduction) or physical deformations, in such organisms or their offspring."
 
 
 [6]
 "Contiguous zone" is defined in 33 U.S.C. § 1362(9) (1976) by reference to the definition of the same term in the Convention of the Territorial Sea and the Contiguous Zone, 15 U.S.T. 1606, 1612-13, TIAS 5639, 516 UNTS 205 (1964). Article 24(2) of the Convention states that "(t)he contiguous zone may not extend beyond twelve miles from the baseline from which the breadth of the territorial sea is measured."
 
 
 [7]
 40 C.F.R. § 125.59(a) (1980) states that:
 A final application for modified section 301(h) permit under this subpart shall be based on either:
 (1) A current discharge into ocean waters or saline estuarine waters; or
 (2) An improved discharge into ocean waters or saline estuarine waters. Provided, That:
 (i) The applicant demonstrates in its final application that such improvements have been thoroughly planned and studied as an alternative to secondary treatment and that it can expeditiously complete or implement such improvements; and
 (ii) The applicant submits, as part of its final application, a proposed schedule for (A) the planning, design and staged construction of secondary treatment, and (B) such other improvements which will provide for the maximum amount of planning, design and construction which can be completed by the applicant pending a final decision on its application; and
 (iii) The applicant has exercised its best efforts to comply with such schedule pending a final decision on its application.
 Section 125.58 defines "current discharge" as "the volume, composition, and location of an applicant's discharge as of anytime between December 27, 1977 and (3 months after date of publication) as designated by the applicant." 40 C.F.R. § 125.58(d). "Improved discharge" is defined as
 (f) "Improved discharge" means the volume, composition and location of an applicant's discharge following:
 (1) Construction of planned outfall improvements, including, without limitation, outfall relocation, outfall repair, or diffuser modification; or
 (2) Construction of planned treatment system improvements; or
 (3) Implementation of a planned program to improve operation and maintenance of an existing treatment system; or
 (4) Implementation of a planned program to eliminate or control the introduction of pollutants into the applicant's treatment works.
 
 
 [40]
 C.F.R. § 125.58(f) (1980)
 
 
 [8]
 The Supreme Court has recently held that similar provisions applying to point sources other than publicly owned treatment works must be complied with even if it means that some businesses will be forced to shut down. EPA v. Nat'l Crushed Stone Ass'n, 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980)
 
 
 [9]
 Section 1412a was added to the Marine Protection Act by the same Congress that added section 1311(h) to the Federal Water Pollution Control Act. See Pub.L.No.95-153, § 4, 91 Stat. 1255 (1977) and Pub.L.No.95-217, § 44, 91 Stat. 1566 (1977). Contemporaneous acts dealing with the same subject matter are construed harmoniously. See Bigelow v. Forrest, 76 U.S. (9 Wall.) 339, 350, 19 L.Ed. 696 (1869); Pacific Legal Foundation v. Quarles, 440 F.Supp. 316, 327 (C.D.Cal.1977) aff'd sub nom. Kilroy v. Quarles, 614 F.2d 225 (9th Cir.), cert. denied, 449 U.S. 825, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980)
 
 
 [10]
 We express no opinion on the level of proof that an applicant for a permit to dump sludge under the Marine Protection Act must meet. We note that the absolute interpretation of section 1412a advanced in the brief for EPA may not be the final position of the Agency. Cf. 44 Fed.Reg. 34797 (1979)
 
 
 [11]
 In addition to the above-mentioned portions of legislative history the Administrator relies on a letter inserted in the record of the Senate debate on the 1977 Amendments as proof that his interpretation of section 1311(h) is correct. (Br. for EPA at 54) The letter in question was written by Thomas Jorling, Ass't Administrator for Water and Hazardous Materials, and addressed to Sen. Muskie. 3 Leg.Hist. 449-50. The letter cannot fairly be read in the manner the Administrator suggests and is of no help on this issue
 
 
 [12]
 Section 1311(h)(6) requires the applicant to show that "to the extent practicable, the applicant has established a schedule of activities designed to eliminate the entrance of toxic pollutants from nonindustrial sources into such treatment works." 33 U.S.C. § 1311(h)(6) (Supp. II 1978)
 
 
 [13]
 The petitioners' other arguments have been considered by the court and found not deserving of a written explanation of the rejection of each contention